Glen D. PALMER
and
State of Illinois, Petitioners,
v.
UNITED STATES CIVIL SERVICE
COMMISSION, Respondent.
Civ. No. 2696.

United States District Court
S. D. Illinois, S. D.
Jan. 12, 1961.

496

William H. South, Asst. Atty. Gen. of Illinois.

Grenville Beardsley, Atty. Gen. of Illinois, for plaintiff.

Harlington Wood, Jr., U. S. Atty., Springfield, Ill., for defendant.

POOS, District Judge.

This case is here on appeal from an Order of the United States Civil Service Commission. The State of Illinois and Glen D. Palmer, Director of Conservation of the State of Illinois, perfect the appeal from the Order.

The Commission issued its "Letter of Charges" to the State of Illinois and Glen D. Palmer, in which it charged that it was in receipt of information which warranted it, under the provisions of Section 12 of the Act of August 2, 1939, as amended July 19, 1940, 54 Stat. 767 (U.S.C.A., Title 5, Section 118k), in making an investigation of improper political activities of Glen D. Palmer, Director of Department of Conservation, State of Illinois. The "Letter" stated that the term "Republican Party" means a political party whose candidates for Presidential electors received votes in the last preceding election at which Presidential electors were selected; the term "political campaign" means the political campaign of a candidate for nomination by, or election as the candidate for nomination by, or election as the candidate of, a political party as defined above, and the term "political management" means the management of a political campaign as defined above. The "Letter of Charges" is dated June 9, 1958, and it charged as follows:

### I.

That Glen D. Palmer has been employed by the Department of Conservation, State of Illinois, since Jan. 28, 1953.

### II.

That by virtue of said employment his principal employment is in connection with an activity, the Department of Conservation, State of Illinois, which is financed in whole or in part by loans and grants made by the United States.

### III.

That while so employed the said Glen D. Palmer took an active part in political management and in political campaigns, in that:

(a) The said Glen D. Palmer has served as precinct committeeman and Chairman of the Kendall County Republican Committee, Kendall County, Illinois, from Jan. 28, 1953, to the present.

(b) The said Glen D. Palmer did file Primary Petitions for Precinct Committeeman of the Republican Party with the County Clerk, Kendall County, Illinois, on Jan. 18, 1954, and Jan. 16, 1956, and as a result thereof was a candidate for and elected to that position in the primary elections of April 13, 1954, and April 10, 1956.

(c) The said Glen D. Palmer did solicit signatures on his own behalf on a primary petition for Precinct Committeeman of the Republican Party in the town of Bristol, Kendall County, Illinois, for the primary election held on April 8, 1958.

(d) The said Glen D. Palmer did file with the County Clerk, Kendall County, Illinois, a Primary Petition for Precinct Committeeman of the Republican Party and an Oath and Statement of Candidacy for the primary election of April 8, 1958.

(e) The name of Glen D. Palmer did appear on the ballot as a candidate for and the said Glen D. Palmer was elected as a Republican Party Precinct Committeeman, Bristol Township, Kendall County, Illinois, in the primary election of April 8, 1958.

### IV.

That the acts herein described on the part of Glen D. Palmer are in violation of Section 12(a) and Section 15 of the Act of Aug. 2, 1939, as amended, 5 U.S.C.A. §§ 118k(a), 118k–1.

This letter was dated and signed in Washington, D. C. by the Assistant General Counsel of the U. S. Civil Service Commission, and was duly served on the respondents, the State of Illinois and Glen D. Palmer.

The State of Illinois and Glen D. Palmer filed answers to the "Letter of

Charges", issue was joined, and the matter came on for hearing before the U. S. Civil Service Commission.

Glen D. Palmer entered into a stipulation with the Commission at the hearing, the effect of which admits the political activity described in Paragraph III of the "Charges". This stipulation was entered into on Sept. 3, 1958, and later, on Oct. 24, 1958, a further stipulation was made in which it was agreed that Glen D. Palmer has held the office of Director of Conservation of the State of Illinois from Jan. 28, 1953, to the present, and that the salary of the Director of Conservation of the State of Illinois is $12,000 per annum.

The United States Civil Service Commission made its case by three witnesses, James H. Wilder, a bookkeeper in the Treasurer's Office of the State of Illinois; Francis A. Whitney, Supervisor of Accounting in the Department of Conservation; and Sam A. Parr, Administrative Assistant in the Department of Conservation of the State of Illinois, all of whom developed the facts on which the Commission entered its order against Glen D. Palmer and the State of Illinois.

The facts show that all monies spent by the Department of Conservation are appropriated by the General Assembly of Illinois, the Legislative Branch of the State Government; that no federal money is spent by the Department, the Department only spending money in accordance with monies appropriated to it by the General Assembly. This is in accordance with the Constitution of the State of Illinois, which provides, in Article IV, Sec. 17 and 18, S.H.A., as follows:

"Sec. 17. No money shall be drawn from the treasury except in pursuance of an appropriation made by law, and on the presentation of a warrant issued by the auditor thereon; and no money shall be diverted from any appropriation made for any purpose, or taken from any fund whatever, either by joint or separate resolution * * *."

"Sec. 18. Each general assembly shall provide for all the appropriations necessary for the ordinary and contingent expenses of the government until the expiration of the first fiscal quarter after the adjournment of the next regular session, the aggregate amount of which shall not be increased without a vote of two-thirds of the members elected to each house, nor exceed the amount of revenue authorized by law to be raised in such time; and all appropriations, general or special, requiring money to be paid out of the state treasury, from funds belonging to the state, shall end with such fiscal quarter * * *"

Thus, under the above quoted sections, the General Assembly must, every two years, appropriate all money spent in running State government. This money can only be withdrawn from the State treasury on a voucher issued by the Auditor of Public Accounts.

The facts further show that there are nine divisions in the Department of Conservation, namely, the Division of Park Memorials, Forestry, Fisheries, Game, Game Management, Engineering, Law, Education and the General Office; that all the Divisions in the Department of Conservation are financed through the Game Fund except Engineering, Parks and Forestry. All divisions are administered by the Director. The Director's duties are full time. The duties that the Director is required to fill are almost a two-man job. The size of the Department requires of him sixty hours a week to handle the work. He is a member of from nine to twelve committees; is required to run the administrative staff, and to administer the entire conservation program, including the ramifications of the entire nine divisions. He must travel throughout the State and out of the State on conservation business. Within the Department there are ten to twelve boards, commissions and councils which the Director, under statutory duties, must run. In addition to the statutory duties, other duties are planning of lakes,

acquisition of land, engineering, stocking of lakes, thirty memorials and forty-five parks to be looked after, plus two conservation areas, new picnic areas to be looked after, new additions to buildings to be supervised, new buildings in process of erection to be supervised, the collection of admission fees, new highway construction to lake areas, construction of lakes, game propagation, many game farms, the rearing, raising and distribution of game birds, supervising personnel, personal interviews with fish and game enthusiasts, requests for stocking of fish to be disposed of and the delivery of fish to lake areas, experimental work with new species of game birds for Illinois, development of game propagation lands, forestry and nursery developments, distribution of trees to the public, accounting in connection with all projects, preparation of budgets, educational film service, public relations work, filling speaking engagements at public fish and game meetings. He must also meet the public who come to his office on conservation matters. These duties are all required by State Law. In addition to these duties, he also has duties with Federal Aid projects, and included among these are the setting up of various developments and new projects, and those that might come under federal aid are submitted by the Department to federal governmental agencies for approval and then turned over to the coordinator, a State employee, who must have his name submitted to and his appointment approved by the Federal Government, after which appointment he handles all such projects and from time of approval he takes over and does the departmental work on these projects. This is done under the rules and regulations of the Bureau of Sports, Fisheries and Wild Life, a division of the United States Department of the Interior. The Department of Conservation has had such a coordinator since 1942.

The duties of the coordinator are to take the project or projects over and carry through until completion, and after completion send the reports in to the Federal Government for reimbursement so that the State of Illinois can recover the monies appropriated by the General Assembly.

The record further shows that all money spent on these projects is State money, appropriated by the General Assembly. The requests for reimbursement are prepared by the coordinator and signed by the Director. State regulations require this. The agreement between the State and the federal agency requires that the coordinator is to be in principal control of all Federal Aid projects. The rules of the Federal Agency that require this are in the Federal Aid in Fish and Wildlife Manual, Section 170, Paragraphs 171.1 through 172.1, which, in brief, provide for the appointment of the coordinator and that he will serve as the principal administrative head of the Federal Aid Program and be responsible therefor through completion.

These various programs are provided for under the following Federal Acts, namely, Pittman-Robertson, Dingell-Johnson, and the Clarke-McNary Acts.

The Pittman-Robertson Act, 16 U.S.C.A. § 669 provides as follows:

"The Secretary of the Interior is authorized to cooperate with the States, through their respective State fish and game departments, in wildlife-restoration projects as hereinafter in sections 669–669b, and 669c–669i of this title set forth; but no money apportioned under said sections to any State shall be expended therein until its legislature, or other State agency authorized by the State constitution to make laws governing the conservation of wildlife, shall have assented to the provision of said sections and shall have passed laws for the conservation of wildlife which shall include a prohibition against the diversion of license fees paid by hunters for any other purpose than the administration of said State fish and game department, except that, until the final adjournment of the first regular session of the legislature held after

September 2, 1937, the assent of the Governor of the State shall be sufficient. The Secretary of the Interior and the State fish and game department of each State accepting the benefits of said sections, shall agree upon the wildlife-restoration projects to be aided in such State under the terms of said sections and all projects shall conform to the standards fixed by the Secretary of the Interior. Sept. 2, 1937, c. 899, § 1, 50 Stat. 917; 1939 Reorg. Plan No. II, § 4(f), eff. July 1, 1939, 4 F.R. 2731, 53 Stat. 1433."

It is under this Section and the other provisions of the Act that Congress has made available funds received from taxes laid on firearms, shells, and cartridges, to the Secretary of the Interior for use by him in cooperation with the States for wildlife restoration.

The Dingell-Johnson Act, 16 U.S.C.A. § 777, is in the same language as the quoted provision above except that the available tax revenue to create the fund is received from taxes laid on fishing rods, creels, reels, and artificial lures, baits and flies for fish restoration and management projects.

The Clarke-McNary Act, 16 U.S.C.A. § 563, provides as follows:

"The Secretary of Agriculture is authorized, and on such conditions as he deems wise, to stipulate and agree with any State or group of States to cooperate in the organization and maintenance of a system of fire protection on any private or State forest lands within such State or States and situated upon the watershed of a navigable river. No such stipulation or agreement shall be made with any State which has not provided by law for a system of forest-fire protection. In no case shall the amount expended in any State exceed in any fiscal year the amount appropriated by that State for the same purpose during the same fiscal year."

16 U.S.C.A. § 564, provides as follows:

"The Secretary of Agriculture is authorized and directed, in cooperation with appropriate officials of the various States or other suitable agencies, to recommend for each forest region of the United States such systems of forest-fire prevention and suppression as will adequately protect the timbered and cut-over lands therein with a view to the protection of forest and water resources and the continuous production of timber on lands chiefly suitable therefor."

16 U.S.C.A. § 565b provides as follows:

"The Secretary of Agriculture is authorized, subject to such conditions as he may prescribe, to transfer, without reimbursement or at such prices and upon such terms as he may impose, to States and political subdivisions or agencies thereof fire lookout towers and other structures or improvements used by the Forest Service for fire prevention or suppression purposes, and the land used in connection therewith if such land is outside national forest boundaries when they are no longer needed by the Forest Service for such purposes but are of value to the State or political subdivision or agency thereof in its fire protection system: *Provided*, That if any property so transferred is not put to use for the purpose for which it was transferred within two years from the date of transfer, or if, within fifteen years from the date of transfer, any such property should cease to be used for the purpose for which it was transferred for a period of two years, title thereto shall revert to and immediately revest in the United States."

16 U.S.C.A. § 567, provides as follows:

"The Secretary of Agriculture is authorized and directed to cooperate with the various States in the procurement, production, and distribution of forest-tree seeds and plants, for the purpose of establishing forests, windbreaks, shelter belts, and

farm wood lots upon denuded or nonforested lands within such cooperating States, under such conditions and requirements as he may prescribe to the end that forest-tree seeds or plants so procured, produced, or distributed shall be used effectively for planting denuded or nonforested lands in the cooperating States and growing timber thereon. The amount expended by the Federal Government in cooperation with any State during any fiscal year for such purposes shall not exceed the amount expended by the State for the same purposes during the same fiscal year, and the Secretary of Agriculture is authorized to make expenditures on the certificate of the State official having charge of the cooperative work for the State that State expenditures as provided for in this section have been made. There is authorized to be appropriated to enable the Secretary of Agriculture to carry out the provisions of this section not more than $1,000,000 for the fiscal year ending June 30, 1950; $1,500,000 for the fiscal year ending June 30, 1951; $2,000,000 for the fiscal year ending June 30, 1952; and $2,500,000 for each subsequent fiscal year."

16 U.S.C.A. § 567a provides as follows:

"For the purpose of stimulating the acquisition, development, and proper administration and management of State forests and of insuring coordinated effort by Federal and State agencies in carrying out a comprehensive national program of forest-land management, the Secretary of Agriculture is authorized to enter into cooperative agreements with appropriate officials of any State or States for, acquiring in the name of the United States, by purchase or otherwise, such forest lands within the cooperating State as in his judgment the State is adequately prepared to administer, develop, and manage as State forests in accordance with the provisions of this

section and section 567(b) of this title, and with such other terms not inconsistent therewith as he shall prescribe, such acquisition to include the mapping, examination, appraisal, and surveying of such lands and the doing of all things necessary to perfect title thereto in the United States: *Provided*, That, since it is the declared policy of congress to maintain and, where it is in the national interest to extend the national-forest-system, nothing herein shall be construed to modify, limit, or change in any manner whatsoever the future ownership and administration by the United States of existing national forests and related facilities, or hereafter to restrict or prevent their extension through the acquisition by purchase or otherwise of additional lands for any national-forest purpose: *Provided further,* That this section and section 567b of this title shall not be construed to limit or repeal any legislation authorizing land exchanges by the Federal Government, and private lands acquired by exchange within the limits of any area subject to a cooperative agreement of the character herein authorized shall hereafter be subject to the provisions of this section and section 567b of this title."

16 U.S.C.A. § 567b provides as follows:

"No cooperative agreement shall be entered into or continued in force under the authority of section 567 (a) of this title or any land acquired under sections 567(a)–567(c) of this title turned over to the cooperating State for administration, development, and management unless the State concerned, as a consideration for the benefits extended to it thereunder, complies in a manner satisfactory to the Secretary of Agriculture with the following conditions and requirements which shall constitute a part of every such agreement: * * *

"(b) In order to insure a stable and efficient organization for the development and administration of the lands acquired under sections 567 (a)–567(c) of this title, the State shall provide for the employment of a State forester, who shall be a trained forester of recognized standing.

"(c) The Secretary of Agriculture and the appropriate authorities of each cooperating State shall work out a mutually satisfactory plan defining forest areas within the State which can be most effectively and economically administered by said State, which plan shall constitute a part of the cooperative agreement between the United States and the State concerned: *Provided,* That nothing herein shall be held to prevent the Secretary of Agriculture from later agreeing with the proper State authorities to desirable modifications in such plan.

"(d) No payment of Federal funds shall be made for land selected for purchase by the United States under sections 567(a)–567(c) of this title until such proposed purchase has been submitted to and approved by the National Forest Reservation Commission created by section 513 of this title.

"(e) Subject to the approval of the National Forest Reservation Commission, the Secretary of Agriculture is authorized to pay out of any available money appropriated for carrying out the purposes of sections 567(a)–567(c) of this title any State, county, and/or town taxes, exclusive of penalties, due or accrued on any forest lands acquired by the United States under donations from the owners thereof, and which lands are to be included in a State or other public forest pursuant to said sections.

"(f) The State shall prepare such standards of forest administration, development, and management as are necessary to insure maximum feasible utility for timber production and watershed protection, and are acceptable to the Secretary of Agriculture and shall apply the same to lands acquired and placed under the jurisdiction of the State pursuant to sections 567(a)–567(c) of this title.

"(g) That with the exception of such Federal expenditures as may be made for unemployment relief, the State shall pay without assistance from the Federal Government the entire future cost of administering, developing and managing all forest lands acquired and over which it has been given jurisdiction under sections 567(a)–567(c) of this title.

"(h) During the period any cooperative agreement made under sections 567(a)–567(c) of this title remains in force, one-half of the gross proceeds from all lands covered by said agreement and to which the United States holds title shall be paid by the State to the United States and covered into the Treasury. All such payments shall be credited to the purchase price the State is to pay the United States for said land, such purchase price to be an amount equal to the total sum expended by the United States in acquiring said lands. Upon payments of the full purchase price, either as herein provided or otherwise, title to said lands shall be transferred from the Federal Government to the State, and the Secretary of Agriculture is authorized to take such action and incur such expenditures as may be necessary to effectuate such transfer. * * *

"(j) The State shall furnish the Secretary of Agriculture with such annual, periodic, or special reports as he may require respecting the State's operations under its agreement with him.

"(k) When a State or political unit thereof acquires under tax delinquency laws title to forest lands without cost to the United States and which lands are included within

a State or other public forest, the Secretary of Agriculture, on behalf of the Federal Government, may contribute annually out of any funds made available under section 567(c) of this title not to exceed one-half of the cost of administering, developing, and managing said lands."

16 U.S.C.A. § 568 provides as follows:

"The Secretary of Agriculture is authorized and directed, in cooperation with the land grant colleges and universities of the various States, or in his discretion, with other suitable State agencies, to aid farmers through advice, education, demonstrations, and other similar means in establishing, renewing, protecting, and managing wood lots, shelter belts, windbreaks, and other valuable forest growth, and in harvesting, utilizing and marketing the products thereof. Except for preliminary investigations, the amount expended by the Federal Government under this section in cooperation with any State or other cooperating agency during any fiscal year shall not exceed the amount expended by the State or other cooperating agency for the same purpose during the same fiscal year, and the Secretary of Agriculture is authorized to make expenditures on the certificate of the appropriate State official that the State expenditures, as provided for in this section, have been made. There is authorized to be appropriated annually out of any money in the Treasury not otherwise appropriated, not more than $500,000 to enable the Secretary of Agriculture to carry out the provisions of this section."

16 U.S.C.A. § 568c provides as follows:

"The Secretary of Agriculture is authorized to cooperate with State foresters or equivalent officials of the several States, Territories, and possessions for the purpose of encouraging the States, Territories, and possessions to provide technical services to private forest landowners and operators, and processors of primary forest products with respect to the management of forest lands and the harvesting, marketing, and processing of forest products, and where necessary to avoid uneconomic duplication of certain technical and training services, to make such services available to private agencies and persons. All such technical services shall be provided in each State, Territory, or possession in accordance with a plan agreed upon in advance between the Secretary and the State forester or equivalent official of the State, Territory or possession. The provisions of Sections 568(c) and 568(d) of this title and the plan agreed upon for each State, Territory or possession shall be carried out in such manner as to encourage the utilization of private agencies and individuals furnishing services of the type described in this section."

16 U.S.C.A. § 568e, provides as follows:

"(a) The Congress finds and declares that building up and maintaining a level of timber growing stocks adequate to meet the Nation's domestic needs for a dependable future supply of industrial wood is essential to the public welfare and security; that assisting in improving and protecting the more than fifty million acres of idle non-Federal and Federal lands for this purpose would not only add to the economic strength of the Nation, but also bring increased public benefits from other values associated with forest cover; and that it is the policy of the Congress that the Secretary of Agriculture in order to encourage, promote, and assure fully adequate future resources of readily available timber should assist the States in undertaking needed programs of tree planting.

"(b) Any State forester or equivalent State official may submit to the Secretary of Agriculture a plan for

forest land tree planting and reforestation for the purpose of effecting the policy hereinbefore stated.

"(c) When the Secretary of Agriculture has approved the plan, he is authorized and directed to assist the State in carrying out such plan, which assistance may include giving of advice and technical assistance and furnishing financial contributions: Provided, That, for the non-Federal forest land tree planting and reforestation, the financial contribution expended by the Federal Government during any fiscal year to assist the State to carry out the plan shall not exceed the amount expended by the State for the same purposes during the same fiscal year, and the Secretary of Agriculture is authorized to make financial contributions on the certificate of the State official in charge of the administration of the plan as to the amount of expenditures made by the State.

"(d) In any plan that coordinates forest lands under the jurisdiction of any Federal agency other than the Department of Agriculture, the Secretary of Agriculture shall obtain the cooperation and assistance of the Federal agency having jurisdiction and the appropriate State forester in the approval and carrying out of the plan.

"(e) The Secretary of Agriculture may prescribe such rules and regulations as may be appropriate to carry out the purposes of this section. * * *.''

This Act gives consent of Congress to each of the several states to enter into any agreement or compact, not in conflict with any law of the United States, with any other state or states for the purpose of conserving forests, etc. This Act is to be carried out by the United States Secretary of Agriculture.

Each of the Acts contemplates an agreement on the part of Congress with each or any of the States to enter into cooperative agreements to accomplish the respective purposes therein provided for.

The General Assembly of Illinois has enacted legislation as required by the respective Acts to enable cooperation on the part of the State in so far as its constitutional powers permit it to do. This is Section 63b1, Chapt. 127, Illinois Revised Statutes 1959, which provides as follows:

"§ 63c. The Department of Conservation further shall have the power and authority to enter into agreements with appropriate federal agencies in order to better effect cooperative undertakings in the conservation, preservation, distribution and propagation of fish, mussels, frogs, turtles, game, wild animals, wild fowls, birds, trees, plants and forests."

This is the section of Illinois law that enables the State to enter into contracts with Federal agencies as provided in the three Federal Acts above mentioned. The record shows that contracts were made with the United States Interior Department for fish and game purposes and with the United States Agricultural Department for forestry purposes. The record further shows that federal aid projects are paid for with funds appropriated by the General Assembly of Illinois, and that after projects are completed the State is reimbursed for the federal portion of the project in accordance with the percentages as provided in the respective Federal Acts, and that the federal funds are then paid into the State Treasury upon order of the Auditor of Public Accounts and there remain until the General Assembly reappropriates funds. The federal money received in reimbursement cannot again be withdrawn except upon its appropriation by the General Assembly. It thus appears that in the first instance the monies that are spent by the "Department" here involved is all state money, and that the "Department" is really a mere agency through which federal funds are channelled into the State treasury in accord-

ance with the contracts made as afore-mentioned.

It further appears from the record that the only projects that the Director has to be concerned with are those contemplated under the contractual agreements entered into with the United States Interior Department over fish and wildlife. The forestry programs entered into with the United States Department of Agriculture are conducted by the State Forester, who, under Illinois law, is appointed by the Director, who must qualify with the Federal Agency, and after the State Forester is appointed and qualified the Director has no further control over him.

It further appears from the record that the total amount of federal funds channelled into the State Treasury over the six-year period in question is $2,263,-661.20, and that the General Assembly appropriated for the Department, during the same period, the sum of $35,975,405.-21. The record for the monies received under the three Federal Acts breaks down as follows:

Pittman-Robertson, $1,438,349.52; Dingell-Johnson, $449,225.39, and Clarke-McNary, $376,086.29. The first is reimbursement of 4%; the second is reimbursement of 1.25%; and the third is reimbursement of 1.05% to the State of the monies appropriated to the Department of Conservation during the six-year period under the respective contracts.

The record also shows that the "Director" devoted less than 1% of his time to the projects for which the State was reimbursed during the six-year period, except none to forestry.

The "Director" stated that in all the past history of the Department, the Hatch Act had never been applied to his office; that he was appointed to his office by the Governor; the appointment was confirmed by a majority vote of the State Senate; that his appointment ran for two years at a time and that the Governor could remove him only with cause, as provided in Article V, Section 12 of the Illinois Constitution.

The State of Illinois and Glen D. Palmer raised the question of the constitutionality of Section 12(a) of the Hatch Act at the hearing. R. Page 9. The other questions raised in the record are that the Department of Conservation is not an activity financed in whole or in part by the Federal Government; that neither of the respondents are able to determine from the meaning of Section 12 what is meant by the term "loan or grant", because the terms are not defined in Section 12; that Section 12(a) provides certain exemptions to State employees or officers from the operation of the Hatch Act which applies to elected heads of executive departments of the State who are not covered by the merit or Civil Service system or program, and that it becomes apparent when the exemption is read together with other exemptions under Section 12(a), the phrase "duly elected" should be interpreted in a broad sense to include "appointed or selected officials", which is a statutory construction problem; the de minimis rule; and the discriminatory exemptions provided for federal executive officers when the same exemptions are not given to State equivalent executive officers. R. pp. 8–10.

After full hearing the Commission hearing officer found that the respondent, Glen D. Palmer, Director of the Department of Conservation, is found to have engaged in political activities clearly in violation of Sec. 12(a) of the Hatch Act, provided that he was subject thereto; that the State of Illinois received substantial grants from the United States for the benefit of the Department of Conservation; that the Director of the Department of Conservation is not the elected head of an executive department; and finally, in recognition of the defense de minimis non curat lex, the respondent, Palmer, should not be held accountable in this proceeding for political activities. The Commission refused to accept the recommendation of the hearing officer as to the de minimis doctrine and held that it was inapplicable in this case. The Commission affirmatively

found that Glen D. Palmer violated Section 12(a) of the Hatch Political Activities Act as alleged in the "Letter of Charges", and that his removal from the position of Director of the Department of Conservation (with ineligibility for reemployment by the State of Illinois within 18 months) is warranted. The order was duly entered of record, and this appeal therefrom perfected.

It is necessary for the Court to examine the record in detail as has been done and to apply the law in the light of all the legal questions raised.

Section 12(a) of the Hatch Act, also designated Section 118k, Title 5 U.S.C.A., and found at 54 Stat. 767, is as follows:

"118k. Employees of State or local agencies financed by loans or grants from United States—Influencing elections; officers or employees defined.

"(a) No officer or employee of any State or local agency whose principal employment is in connection with any activity which is financed in whole or in part by loans or grants made by the United States or by any Federal agency shall (1) use his official authority or influence for the purpose of interfering with an election or a nomination for office, or affecting the result thereof, or (2) directly or indirectly coerce, attempt to coerce, command, or advise any other such officer or employee to pay, lend or contribute any part of his salary or compensation or anything else of value to any party, committee, organization, agency, or person for political purposes. No such officer or employee shall take any active part in political management or in political campaigns. All such persons shall retain the right to vote as they may choose and to express their opinions on all political subjects and candidates. For the purposes of the second sentence of this subsection, the term "officer or employee" shall not be construed to include (1) the Governor or Lieutenant Governor of any State or any person who is au-thorized by law to act as Governor, or the mayor of any city; (2) duly elected heads of executive departments of any State or municipality who are not classified under a State or municipal merit or civil-service system; (3) officers holding elective offices."

Section 118k(b) provides for hearing for any violation of 118k(a) by the "Commission" and the requisite procedure, by notice to the offendor, setting forth the alleged violation and the time and place for hearing and after hearing for the entry of an order finding the violation and fixing the penalty. The penalty clause of Subsection (b) provides:

"After such hearing, the Commission shall determine whether any violation of such subsection has occurred and whether such violation, if any, warrants the removal of the officer or employee by whom it was committed from his office or employment, and shall by registered mail notify such officer or employee and the appropriate State or local agency of such determination."

If the officer or employee is not discharged within 30 days, the Commission is to certify to the Federal Agency supplying money an order requiring it to withhold from its loans or grants to the State "an amount equal to two years' compensation at the rate such officer or employee was receiving at the time of such violation", all of which must be done by the Commission. Notice of the order must be sent by registered mail, and the order of the "Commission shall become final upon the expiration of thirty days after the mailing of notice" except as provided in Subsection (c). This Subsection (c) provides for appeal to the District Court, the Court to review on the entire record, including all of the evidence taken on the hearing, and which shall extend to questions of fact and law. This subsection further provides:

"The Court shall affirm the Commission's determination or order * * * if the court determines that

the same is in accordance with law. If the court determines that any such determination or order * * * is not in accordance with law, the court shall remand the proceedings to the Commission with directions either to make such determination or order as the court shall determine to be in accordance with law or to take such further proceedings as, in the opinion of the court, the law requires."

During the course of respondent Palmer's directorship there was in full force and effect the following provisions of the Constitution of Illinois, viz.:

Article V, Sec. 6, Constitution of 1870.

"Sec. 6. The supreme executive power shall be vested in the governor, who shall take care that the laws be faithfully executed."

"Sec. 10. The governor shall nominate, and by and with the advice and consent of the Senate, (a majority of all the senators elected concurring, by yeas and nays) appoint all officers whose offices are established by this constitution, or which may be created by law, and whose appointment or election is not otherwise provided for; and no such officer shall be appointed or elected by the general assembly."

"Sec. 12. The governor shall have power to remove any officer whom he may appoint, in case of incompetency, neglect of duty, or malfeasance in office; and he may declare his office vacant, and fill the same as herein provided in other cases of vacancy."

"Sec. 23. The officers named in this article shall receive for their services a salary to be established by law, which shall not be increased or diminished during their official terms * * *."

"Definition and Oath of Office."

"Sec. 24. An office is a public position created by the constitution or law, continuing during the pleasure of the appointing power, or for a fixed time, with a successor elected or appointed. An employment is an agency, for a temporary purpose, which ceases when that purpose is accomplished."

"Sec. 25. All civil officers, except members of the general assembly and such inferior officers as may be by law exempted, shall, before they enter on the duties of their respective offices, take and subscribe the following oath or affirmation: 'I do solemnly swear (or affirm, as the case may be) that I will support the constitution of the United States, and the constitution of the State of Illinois, and that I will faithfully discharge the duties of the office of ——— according to the best of my ability.'

"And no other oath, declaration or test shall be required as a qualification."

Article IV, Section 1 of the Constitution of Illinois provides:

"The legislative power shall be vested in a general assembly, which shall consist of a senate and house of representatives, both to be elected by the people."

In pursuance of this constitutional power, the General Assembly in the year 1917, and as subsequently amended, passed the "Civil Administrative Code", providing for the creation of departments of State government. This Code is found at Chapt. 127, State Government, I.R.S., 1959, p. 1893. This Code, by Section 2, provides:

"Sec. 2. The word 'department,' as used in this Act shall * * * mean the several departments of the State Government as designated in Section 3 of this Act and none other."

Section 3 provides for fifteen departments of State government. Among these is the Department of Conservation. Sec. 4 of the Act provides:

"Each department shall have an officer at its head who shall be

known as a director and who shall * * * execute the powers and discharge the duties vested by law in his respective department.

The following officers are hereby created: * * * [Among others are:] Director of Conservation, for the Department of Conservation * * * Director of Personnel for the Department of Personnel."

It is thus apparent that under the constitutional provisions and the laws enacted pursuant thereto that respondent Palmer is a State officer, and not a State employee. His appointment came from the "Supreme Executive power", the Governor. The office was created by the General Assembly, in which the Illinois Constitution vests the legislative power to enact laws and create the office by the enactment of laws.

The qualifications of the Director of Conservation are not prescribed by the Code. Section 11 of the Code provides:

"Each officer provided for by this Act shall perform such duties as may be prescribed by law for his position and to the best of his ability shall render faithful and efficient service in the performance of his duties, to the end that the public interest and welfare may be furthered."

Section 12 of the Code provides that the appointment of all officers created by the Code shall be made by the Governor, by and with the advice and consent of the State Senate. Sec. 13 provides a term of office of two years. Sec. 14 provides for the constitutional oath of office. Sec. 15 provides for a bond and Sec. 20 authorizes the employment of necessary employees. Nothing in the Act provides that respondent Palmer shall not be a precinct committeeman, nor is there any provision in the Act that prevents him from being a political party county chairman. There is only one office created by the Code which requires freedom from political activity, and that is the office of Director of Personnel. Sec. 63b105 of the Administrative Code provides the qualifications of the Director

of the Department of Personnel. This Section provides:

"63b105. The Department of Personnel shall have an officer at its head who shall be known as the Director of Personnel. He shall be appointed by the Governor, by and with the advice and consent of the Senate, as provided in the Civil Administrative Code of Illinois, and shall be subject to the provisions of that Code except as herein otherwise provided. The Director of the Department of Personnel shall be a person who shall have had practical working experience in the field of personnel administration. The Director shall be selected for appointment from among those persons who for the two years next preceding the appointment have not been members of any local, state or national committee of any political party; or officers or members of standing committees of any partisan political group or organization. Nor shall the appointee during his tenure as Director of Personnel become a member of any local, state or national committee of a political party, or an officer or member of standing committees of any partisan political group or organization."

The Illinois Personnel Code, under Sec. 63b104c(7), (Sec. 4c) of the Code, I.R.S., Vol. II, 1959, Chapt. 127, specifically exempts "Directors of Departments * * * and all other positions appointed by the Governor by and with the consent of the Senate" from the provisions of the Personnel Code.

The public policy of Illinois, as declared by its law in respect to political activity, is different from the policy as declared in Sec. 12 (§ 118k) known as the Hatch Act. The Hatch Act Section in question states among other things,

"No such officer * * * shall take any active part in political management or in political campaigns * * * For the purposes of the second sentence of this subsection, the term 'officer or employee' shall not

be construed to include (1) the Governor or the Lieutenant Governor of any State or any person who is authorized by law to act as Governor, or the mayor of any city; (2) duly elected heads of executive departments of any State or municipality who are not classified under a State or municipal merit or civil service system; (3) officers holding elective offices."

It is apparent that the respondent is excluded from the exempting clause for the reason that he is not an "elected officer."

Illinois, in further pursuance of its public policy by its General Assembly, adopted "An Act Concerning Elections", and it is known as the "Election Code" of 1943. This Code is found at Chapt. 46, Elections, § 1–1 et seq., I.R.S. of 1959, Vol. I, p. 1845. This Code provides in detail matters concerning elections. Article 7, Sec. 1 of the Code covers the nomination of all elective candidates, and included in this Section are the candidates of "precinct, township, ward and State central committeemen." The Code also provides a means governing the management of a multi-party system. Article 7, Sec. 2, defines political parties. Article 7, Sec. 8(b) provides for the election of a precinct committeeman of each party, and Article 7, Sec. 8(c) provides for the County Central Committee. Article 7, Sec. 9 provides for the convening of the County Central Committee, and its procedures for the election of a County Chairman of each political party. This provides for an orderly system of political party management.

█ From the standpoint of the public policy of Illinois, as declared by its Constitution and public laws, it is readily apparent that respondent Palmer has violated no law of Illinois. The record shows that he is engaged in a pursuit from which he is paid a salary of $12,-000 per year. In addition to his salary he is also entitled to pension rights under Illinois law, entitled "An Act to provide for the creation, maintenance and administration of a retirement and benefit system for certain officers and employees of the State of Illinois, their dependents and beneficiaries." Approved July 23, 1943. I.R.S., 1959, Vol. II, Chapt. 127, State Government, Secs. 215 through 246. This statute, among other things, provides for benefits to be computed on length and continuity of service. Sec. 220.

The Hatch Act authorizes the Commission to make a finding that the political activity warrants the removal of the officer, and after notice to the officer and the State of such finding, and a failure to so remove such officer within 30 days, the Commission shall certify to the Federal Agency involved this fact, whereupon the Federal Agency shall withhold an amount equal to two years' compensation at the rate such officer was receiving at the time of such violation, in this instance, $24,000. The record shows that the project or projects have been completed and paid for with money of Illinois. Illinois raises its funds through taxation of its citizens as provided for by Illinois law.

There is no provision of Illinois law that authorizes the suspension of an officer for eighteen months, nor is there any specific Illinois law that provides for the discharge of a State officer for a period of eighteen months. The Director of Conservation is appointed by the Governor for a period of two years, by and with the advice and consent of the Illinois State Senate, and after confirmation, is to hold office for that term.

There are only two ways by which a State officer of Illinois can be removed from office. One is by impeachment and trial, as provided by Article IV, Sec. 24, Illinois State Constitution, Ill.Rev.Stat. 1959, Vol. 1, p. 13, which provides as follows:

"Impeachment. Sec. 24. The house of representatives shall have the sole power of impeachment; but a majority of all the members elected must concur therein. All impeachments shall be tried by the senate; and when sitting for that purpose, the senators shall be upon

oath, or affirmation, to do justice according to law and evidence * * * No person shall be convicted without the concurrence of two-thirds of the senators elected. But judgment, in such cases, shall not extend further than removal from office, and disqualification to hold any office of honor, profit or trust under the government of this state. * * *"

■ This provision of the Constitution does not provide the basis for returning a bill of impeachment, but it does provide that the senators shall be upon oath or affirmation to do justice according to law and evidence. The meaning generally ascribed to such a provision is that impeachment proceedings generally lie as a rule for treason, bribery or any high crime or misdemeanor in office. Newsome v. Cocke, 44 Miss. 352, 7 Am. Rep. 686. The grounds must be causes attaching to the qualifications of the officer, or his performance of his duties, showing that he is not a fit and proper person to hold the office. Moulton v. Scully, 111 Me. 428, 89 A. 944.

In State v. Hastings, 37 Neb. 96, 55 N.W. 774, it is said:

> Where the act of official delinquency consists in the violation of some provision of the constitution or statute which is denounced as a crime or misdemeanor, or where it is a mere neglect of duty, willfully done, or where the negligence is so gross and the disregard of duty so flagrant as to warrant the inference that it was willful or corrupt, it is a misdemeanor in office; but mere negligence or mere excess of power without corrupt intention is not a 'crime or misdemeanor' for which the officer should be impeached.

The Illinois Constitution provides, under Article V, Sec. 15:

> "Sec. 15. The governor, and all civil officers of this state, shall be liable to impeachment for any misdemeanor in office."

Thus in Illinois impeachment lies only for misdemeanor in office.

It is to be noticed here that there is no showing that any public funds, either Illinois or Federal, have been wasted through any political activity, or that the public has in any way been prejudiced. In fact, the rules and regulations which are included in the record amply protect the expenditure of any funds used and expended in any of the cooperative projects here involved from waste or misuse of any kind or type. The projects must be approved by either the Secretary of the Interior or the Secretary of Agriculture, and it must be shown that economy and efficiency in the completion of the projects were attained; on contracts entered into by the State, competitive bidding must be allowed. The State is required to maintain "an adequate and competent force of employees to initiate and carry projects through to satisfactory completion." The personnel are to be selected "on the basis of their competence to perform the services required, and shall conduct their duties in a manner acceptable to the Secretary." The manual also provides that as to the selection of personnel employed on projects, "it should be the policy of every state to develop and maintain a staff of permanent employees, well qualified by training and experience to carry the programs forward in the highest degree of efficiency." Qualifications of all personnel to be employed in technical or responsible supervisory positions must be submitted to and approved by the Bureau. In case approval is not granted, Federal participation in payment of salaries and expenses will not be allowed. There is no question here of the violation of any rule laid down by the Federal government. In fact all rules and regulations must be obeyed or Federal funds will not be paid. It can hardly be said that any grounds exist for the filing of a bill of impeachment as against this State officer under Illinois law.

■ The other method for removal of a State officer is also provided in the State Constitution. Article V, Sec. 12 provides:

"The governor shall have power to remove any officer whom he may appoint, in case of incompetency, neglect of duty, or malfeasance in office; and he may declare his office vacant, and fill the same as is herein provided in other cases of vacancy."

The Supreme Court of Illinois, in Wilcox v. People ex rel. Lipe, 90 Ill. 186, 204, in construing this section, has declared that power under the above section to remove exists in the governor for any one of the three causes specified in the following language:

"Undoubtedly, the Governor can only remove for some one of the causes specified; but the removal here was for one of these causes— incompetency. The Governor ascertained the existence of the cause here, and made the removal on account of it. The constitution is silent as to who shall ascertain the cause of removal or the mode of its ascertainment. It simply gives to the Governor the power to remove any officer whom he may appoint, in case of incompetency, etc. It follows, then, that it is with the Governor, who is to act in the matter, to determine, himself, whether the cause of removal exists, from the best lights he can get, and no mode of inquiry being prescribed for him to pursue, it rests with him to adopt that method of inquiry and ascertainment as to the charge involved which his judgment may suggest as the proper one, acting under his official responsibility, and it is not for the courts to dictate to him in what manner he shall proceed in the performance of his duty, his action not being subject to their revision. The constitution of this State not only declares that the powers of the government of the State shall be divided into three distinct departments, but has expressly prohibited the exercise of any of the powers properly belonging to one by either of the others."

To the same effect, removal only for the causes specified, is Humphrey's Executor v. United States, 295 U.S. 602, 55 S.Ct. 869, 873, 79 L.Ed. 1611.

█ █ Now the courts of Illinois can not act to require the Governor to make a finding because, as pointed out, the courts would be usurping a constitutional power that is wholly within the prerogative of the chief executive power, the governor of the state. Next examine the three causes, (1) incompetency, (2) neglect of duty, and (3) malfeasance in office. The record here shows no incompetency, no neglect of duty in the administration of the office, and no malfeasance in office. It only shows that he is a party precinct committeeman and a party county chairman. Both positions are provided for under the Illinois Election Code, and no Illinois law prohibits the Director of Conservation as such from acting in these party positions. The only Illinois department head who is restrained by law from holding such political party positions is the Director of Personnel. This restraint is provided for by Sec. 63b105, Chapt. 127, State Government, I.R.S.1959, p. 1928. Sec. 63b104c(7) of the same Chapter specifically exempts from the Personnel Code, "(7) Directors of Departments * * * and all other positions appointed by the Governor by and with the consent of the Senate." Thus, under Illinois law, and upon the complete showing in this record, no valid cause exists for removal unless it can be said that the order of the Civil Service Commission, an agency of the Federal Government, can require the Chief Executive of Illinois to exercise his prerogatives under the Illinois Constitution, when in fact no legal cause exists under Illinois law. The Congress of the United States under the separation of powers in the Federal Constitution cannot require the President of the United States to surrender any of his executive power, Myers v. United States, 272 U.S. 52, 119, 125, 126, 161, 47 S.Ct. 21, 71 L.Ed. 160, nor can it do so to the Governor of Illinois.

Thus the Order of the Commission as rendered under the Hatch Act places Illinois in the anomalous position of being required to summarily discharge the Director of Conservation when, in fact, under Illinois law no such procedure for discharge is provided for. Illinois being unable to act, must therefore forfeit out of the moneys contracted with the Federal Agency, a sum equivalent to twice the annual salary of the Director, in this case, $24,000. The record in this case shows that Illinois, out of its tax appropriations, has spent the money on the completed project under all the requirements of the three acts of Congress above set out and in strict accordance with the regulations prescribed by the Federal Agency as found in this record. Illinois is bound by its own law. It can only act under the law. The moneys spent were appropriated by the General Assembly under the authority granted to it by the Illinois Constitution, Article IX, Sec. 1, which provides:

"The general assembly shall provide such revenue as may be needful by levying a tax, by valuation, so that every person and corporation shall pay a tax in proportion to the value of his, her or its property—, etc.",

and by Article IV, Sec. 17, which provides:

"No money shall be drawn from the treasury except in pursuance of an appropriation made by law, and on the presentation of a warrant issued by the auditor thereon; and no money shall be diverted from any appropriation made for any purpose, or taken from any fund whatever, either by joint or separate resolution."

Under these sections of the State Constitution the tax was levied and the appropriation made to carry out the various project purposes as contemplated by the three Federal Acts providing for the cooperative purposes joined by Illinois statutes authorizing the cooperative purposes as above pointed out. Where

is Illinois to recover the $24,000 in question? It is faced with the Constitutional provision, Article IX, Sec. 1, authorizing the levy of the tax, and Article IV, Sec. 17, authorizing the appropriation and the manner in which it was drawn from the State Treasury to complete the project, expecting that the proportionate cooperative share of $24,000 would be repaid, yet it, on the failure of repayment, is also faced with the proposition that to make up the $24,000 under Article IV, Sec. 17, "that no money shall be diverted from any appropriation made for any purpose, or taken from any fund whatever, either by joint or separate resolution." This can only mean one thing, that under the Illinois Constitution and Illinois law, the appropriated fund in question will be short to the extent of $24,000, if the Order of the Civil Service Commission is to stand. Illinois has one source of revenue to run the State Government and that comes from taxes levied on its citizens. Can it be said that the Hatch Act in this case only incidentally has an effect on certain activities within the State? No case of record, except State of Oklahoma v. United States Civil Service Commission, 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794, has ever so held and in that case the factual matters were not the same as in this case. First, Illinois has not yielded, nor has the Director yielded. Both have appealed from the decision of the Civil Service Commission, judicially asserting what they believe are their legal, constitutional rights. Secondly, as far as this Court is able to ascertain from a careful study of the opinions in the Court of Appeals and in the Supreme Court, this question here involved, that of an Act of Congress, striking at the revenue of a state, was never raised. The court in Oklahoma decides three questions, (1) that the United States has no power to regulate local political activities of state officials, (2) that it does have power to fix the terms upon which its money allotments to states shall be disbursed, and (3) that the Tenth Amendment does not forbid the exercise

of the power in the way that Congress has proceeded. As to point one, there is no doubt and as to point three, the Tenth Amendment is not a source of power and cannot be relied upon as a grant of power. Power to act must be found in the grants of power as given to the United States. As to point two, "that Congress has power to fix the terms upon which its money allotments to states shall be disbursed", the Court did not have called to its attention any constitutional provision showing where the power came from, nor was any case shown or called to the attention of the Court that permitted Congress to pass any Act that struck at revenue or moneys of the State itself. The State of Illinois, as does the Federal Government, has the right as a prerogative of government, to hire and fire its employees, and has the undoubted right to appoint, confirm and provide the qualifications for State officers free from control of the United States. See Cummings v. State of Missouri, 4 Wall. 277, 18 L.Ed. 356, 361, where the Court announces the rule that it is well settled and generally recognized that there is a wide range of particular unexpressed powers which have been reserved to the States, such as, for illustration, the right to determine the qualifications for state officers and the conditions on which its citizens may exercise their various callings and pursuits within its jurisdiction. The federal and state governments can cooperate to a common end provided each of them is authorized to reach it. This cooperation must be effectuated by an exercise of the powers which they severally possess, and not by an exercise through invasion or surrender by one of them of the governmental power of the other. The power to remove executive officers appointed by the chief executive power is an executive function, and cannot be controlled by the legislative authority. This proposition of constitutional law is well established under the decision of the Supreme Court in so far as the National government is concerned in the case of Myers v. United States, 272 U.S. 52, at pages 119, 125, 47 S.Ct. 21, at pages 26, 28, 71 L.Ed. 160. The Court said, pages 161, 164,

"Removal of executive officials from office is an executive function; the power to remove, like the power to appoint, is part of 'the Executive power,' a conclusion which is confirmed by the obligation 'to take care that the laws be faithfully executed.' "

The Court further said, pages 119, 125,

"The President is empowered by the Constitution to remove any executive officer appointed by him by and with the advice and consent of the Senate, and this power is not subject in its exercise to the assent of the Senate nor can it be made so by an act of Congress."

Again at pages 119, 121, 126, 161,

"The power of removal is an incident of the power to appoint; but such incident does not extend the Senate's power of checking appointments, to removals."

The Illinois constitutional provisions are the same as the Federal constitutional provisions concerning power and separation of powers. Article V, Sec. 6, of the Illinois Constitution, is as follows:

"Sec. 6. The supreme executive power shall be vested in the governor, who shall take care that the laws be faithfully executed.",

and Article V, Sec. 10, as follows:

"Sec. 10. The governor shall nominate, and by and with the advice and consent of the senate, (a majority of all the senators elected concurring, by yeas and nays,) appoint all officers whose offices are established by this constitution, or which may be created by law, and whose appointment or election is not otherwise provided for; and no such officer shall be appointed or elected by the general assembly."

These sections are similar in import to Article II, Sections 1, 2 and 3 of the United States Constitution, pro-

viding for the executive department. As stated in Myers v. United States, supra, this Article prevents the Congress from passing legislation that would provide for removal or recall of an officer nominated by the President and confirmed by the Senate. Since Congress does not have this power as to officers appointed by the Chief Executive authority of the National Government, it certainly cannot be said that it has such authority to provide by legislation for the removal of a state officer appointed by the Governor of Illinois and confirmed by the Illinois State Senate. To say that Congress has this authority would be to say that it has the right to usurp State of Illinois sovereignty. This authority is lacking in the General Assembly of Illinois, and in the Illinois judicial department as pointed out above in the case of Wilcox v. People ex rel. Lipe, 90 Ill. 186, 204.

In pursuance of its constitutional authority, the General Assembly passed the "Civil Administrative Code" providing for Directors to run the various executive departments of State government. Section 12, Chapt. 127, I.R.S. 1959 provides that the officer nominated by the Governor to a directorship, shall be confirmed by the Illinois State Senate before his appointment becomes effective. The Director of Conservation is one of the offices authorized by the Illinois Constitution under the words, "which may be created by law", found in Article V, Section 10.

Examine Sec. 12(a), Title 5, § 118k, U.S.C.A. of the Hatch Act, and one finds it is worded as follows:

"No officer * * * of any State * * * whose principal employment is in connection with any activity which is financed in whole or in part by loans or grants made by the United States or by any Federal agency shall (1) use his official authority or influence for the purpose of interfering with an election or a nomination for office, or affecting the result thereof, or (2) directly or indirectly coerce, attempt to coerce, command, or advise any other such officer or employee to pay, lend, or contribute any part of his salary or compensation or anything else of value to any party, committee, organization, agency, or person for political purposes. No such officer * * * shall take any active part in political * * * campaigns. * * * For the purposes of the second sentence of this subsection, the term 'officer' * * * shall not be construed to include (1) the Governor or Lieutenant Governor of any State or any person who is authorized by law to act as Governor ·* *. (2) duly elected heads of executive departments of any State * * * (3) officers holding elective offices."

Now compare this Section dealing with State officers, with Sec. 9(a), Title 5, Sec. 118i, which provides as follows:

"(a) It shall be unlawful for any person employed in the executive branch of the Federal Government, or any agency or department thereof, to use his official authority or influence for the purpose of interfering with an election or affecting the result thereof. No officer or employee in the executive branch of the Federal Government, or any agency or department thereof, shall take any active part in political management or in political campaigns. All such persons shall retain the right to vote as they may choose and to express their opinions on all political subjects and candidates. For the purposes of this section the term 'officer' * * * shall not be construed to include (1) the President and Vice President of the United States; (2) persons whose compensation is paid from the appropriation for the office of the President; (3) heads and assistant heads of executive departments; (4) officers who are appointed by the President, by and with the advice and consent of the Senate, and who determine policies to be pursued by the United States in its relations with

foreign powers or in the Nation-wide administration of Federal Laws."

It is apparent, after reading the two sections, that Congress exempts from the provisions of Sec. 9(a), Title 5, 118i, "(3) heads and assistant heads of executive departments; (4) officers who are appointed by the President, by and with the advice and consent of the Senate, and who determine policies to be pursued by the United States in its relations with foreign powers or in the Nation-wide administration of Federal Laws." To exclude this class of officers as set out in subdivisions (3) and (4) would clearly have made this section unconstitutional as a usurpation of executive power. Myers v. United States, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160, and Humphrey's Executor v. United States, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611. Congress with these inclusive exemptions in Sec. 9(a), 5 U.S.C.A. § 118i, recognizes that its authority is limited in this respect, yet it fails to give the same exemption to the appointed and Illinois State Senate confirmed heads of the executive departments of the State Government, and the appointed heads and assistant heads of executive departments of State of Illinois government. Can it not be reasonably and constitutionally said, that while the various acts providing funds as above set out are acts of cooperation between the States and Federal governments, that Congress, in its failure to exempt the heads of State executive departments, who also determine policy, has acted to treat Illinois as an agency of the Federal Government incapable of running its own internal affairs, rather than as an equal independent sovereign fully capable of determining the qualification of its executive officers free from interference of the United States, and also fully capable of providing for the recall of State officers under its own constitutional processes and duly enacted State laws free from interference by the United States?

Article IV, Sec. 4 of the United States Constitution, provides:

"The United States shall guarantee to every State in this Union a Republican form of Government * * *."

This provision has been fully considered in State of South Carolina v. United States, 199 U.S. 437, 454, 26 S.Ct. 110, 113, 50 L.Ed. 261, where the Court said:

"Each State is subject only to the limitations prescribed by the Constitution and within its own territory is otherwise supreme. Its internal affairs are matters of its own discretion. The Constitution provides that 'the United States shall guarantee to every State in this Union a republican form of government.' Art. IV, Sec. 4. That expresses the full limit of National control over the internal affairs of a State."

Examine 12(a), and 12(f) (1) in the light of this constitutional provision. Congress exerts power to exclude from the term "officer and employee" the Governor, Lieutenant Governor of any State, or any person who is authorized by law to act as Governor, and defines under 12(f) (1) the term "state or local agency" to mean the executive branch of any state, or of any municipality or other political subdivision of such State, or any agency or department thereof.

The Illinois Constitution as above pointed out makes the Governor the supreme executive authority of the State. Section 12(f) (1) defines the term "State" to mean "the executive branch of any State". It is clear that the Hatch Act, by congressional expression, is directed at the executive branch of state government. Unless there is an executive branch, state government could not exist. The source of power for the executive branch is Article V of the Illinois Constitution, and the authority for removal of a state officer comes from Section 12 thereof. Thus the Hatch Act is directed to telling the State of Illinois that unless Illinois removes the officer, Illinois will not be entitled to share in contracts of cooperation, unless she suffers the loss of twice the annual

salary of the officer under contracts legitimately entered into in a spirit of cooperation; or Illinois, you must surrender the right of sovereignty to determine the qualification of a state officer if you expect to share in the contractual right of cooperation offered by the three federal acts here involved. Illinois undoubtedly has the constitutional right to lay down the rules for the qualifications of state officers in carrying on the internal affairs of State government, irrespective of what Congress may desire, and this power similarly rests in Congress under the Federal Constitution, in so far as the National Government is concerned.

Illinois, in fact, has provided under its own Political Activities Act that employees have the right to engage in political activities. This Act is found under "Political Activity", Chapt. 24½, Vol. I, I.R.S.1959, §§ 38s, 38t, 38u and 38v, p. 998. This Act provides:

"38s. § 1—Application of Act. This act shall apply to all employees of the State whose employment or tenure is subject to recognized merit principles of public employment."

"38t. § 2. Prohibited Political Activity. Any employee subject to this Act may be discharged in accordance with the discharge procedures controlling his position for participation during regular working hours in any of the following acts:

"(a) Participating in the organization of any political meeting.

"(b) Soliciting money from any person for any political purpose.

"(c) Selling or distributing tickets for political meetings.

"(d) Assisting at the polls in behalf of any party or party-designated candidate on any election day.

"(e) Using or threatening to use the influence or authority of his position to coerce or to persuade any person to follow any course of political action.

"(f) Initiating or circulating any petitions on behalf of a candidate or in support of a political issue.

"(g) Making contributions of money in behalf of any candidate for office or of any public or political issue.

"(h) Distributing campaign literature or material in behalf of any candidate."

"In respect to employees whose salaries are paid in whole or in part by federal funds and whose employment is subject to the Federal standards for a Merit System of Personnel Administration applicable to grant-in-aid programs, the prohibited political activities enumerated in this Section may not be engaged in at any time, whether during or outside of regular working hours. Violation of this prohibition by any such employee shall subject him to discharge in accordance with the procedures controlling his position. Nor shall this Act be deemed to authorize conduct prohibited by the Federal Hatch Act by employees subject to said Act.

"38u. Membership not to affect employment. Contributions not to be a condition of employment. § 3.

"No employee hereunder shall be denied or deprived of employment solely because he is a member or an officer of a political committee, of a political party, or of a political organization or club; nor shall he be required as a condition of his employment or tenure to work or make contributions in behalf of any political party or any candidate for political office."

"38v. Prohibition against inducing employees to violate act. § 4. No person shall coerce, induce, persuade or attempt to coerce, induce or persuade any employee to violate any of the provisions of this Act."

This Act, in plain definite language, protects Federal funds from political waste or dissipation by employees or any one attempting to persuade or coerce them. It was enacted by the General Assembly under its prerogative to pass laws. Thus Illinois in its cooperative spirit has

done everything that Congressional co-operation provides for in so far as Congressional cooperation can require under Constitutional procedures in so far as its employees are concerned, and it prohibits any one *including a State officer* by Section 38v or Section 4, from coercing, inducing, persuading or attempting to persuade any employee to violate any of its provisions.

In furtherance of carrying out the provisions of the Political Activities Act, Illinois has on its Statute books, a Personnel Code. Section 2 of this Act, Chapt. 127, State Government, Paragraph 63b102, I.R.S.1959, declares that its purpose "is to establish for the government of the State of Illinois a system of personnel administration under the Governor, based on merit principles and scientific methods." Paragraph 63b104, Section 4 of the Act provides that "All offices and positions of employment in the service of the State of Illinois shall be subject to the provisions of this Act unless specifically exempted in this Act." Section 4c, Paragraph 63b104c provides under subdivision (7) for the exemption of "Directors of Departments".

Section 8, Paragraph 63b108, Rules, provides that the Director of Personnel shall prepare and submit rules which shall have the force and effect of law, and that such rules "may provide for such exemptions or modifications as may be necessary to assure the continuity of federal contributions in those agencies supported in whole or in part by federal funds."

Section 16, Paragraph 63b116 provides that all officers and employees of the State shall comply with and aid in all proper ways in carrying out the provisions of this law, and the rules, regulations and orders thereunder, and Section 18, Paragraph 63b118 provides the penalties.

"(1) Any person who wilfully violates any provision of this Act or of the rules shall be guilty of a misdemeanor, and shall upon conviction be punished by a fine of not less than $50 nor more than $500, or by imprisonment for a period not to exceed six months or by both such fine and imprisonment. Each violation shall constitute a separate and distinct offense.

"(2) Any person who is convicted of a misdemeanor under this Act shall, for a period of five years, be ineligible for appointment to or employment in a position in the State service."

All the provisions of this Act protect State employees who are under this Act from political coercion. The Act provides a comprehensive system for State merit service in accordance with Federal standards of merit employment, and the Illinois Political Activities Act in conjunction therewith provides for complete compliance with the Act and Federal Acts under which State-Federal Cooperative programs are carried out. All these State Acts were passed by the Illinois General Assembly under its prerogative to pass State laws as provided in Article IV of the State Constitution. They express the will of Illinois under its prerogatives of government. The Personnel Code specifically exempts a "Director" of a State department from the provisions thereof, as far as his office is concerned; yet it requires the individual holding the office to comply with its terms when it comes to employee personnel in the office under penalties of a misdemeanor as set out above.

When the provisions of Section 12 (a) were before the Senate of the United States for passage, the bill as first presented, included a provision as follows:

"Officers who are appointed by the Governor of any State by and with the advice and consent of the legislature or either house thereof, and who determine policies to be pursued by such state in the state-wide administration of State laws."

This was quite similar to the provision applicable to the officers of the Federal government as above pointed out. When this provision was about to be stricken, the following colloquy took place:

Mr. Clarke of Missouri: "Mr. President, I offer this amendment because I do not believe there is any rhyme or reason in excepting such employees from the operation of the law simply because they happen to be appointed by the Governor and confirmed by the legislature. * * *

Mr. Minton: "Mr. President, will the Senator yield?

Mr. Clarke of Missouri: "I yield to the Senator from Indiana.

Mr. Minton: "Does the Senator see any reason why anybody should be excepted? Why should we except the Governor?

Mr. Clarke of Missouri: "The Governor has been elected by the people of the State, and I can see a reason for exempting him. I can also see a reason for the *second* exception, 'elective heads of executive departments of any State * * *' That is an entirely different thing from allowing a State machine to be built up by the persons included in exception 3, who are usually the main cogs in every State machine. To say that a man who is elected by the people of a State shall have a right to appeal to the people of a State whenever he sees fit is one thing. To say that other officials appointed by the Governor or members of the State machine shall be permitted improperly to use federal funds for the purpose of perpetuating that machine is an entirely different thing.

Mr. Minton: "Mr. President—

Mr. Clarke of Missouri: "I again yield to the Senator from Indiana.

Mr. Minton: "Then, as I understand, it is the Senator's position that he wants to strike out this provision because these people are not elected by the people.

Mr. Clarke of Missouri: "I say there is an essential difference between those who are elected by the people, and those who are appointed * * *

Mr. Minton: "In my State, the State highway commissioners are not elected. They are appointed. They are not confirmed by the Senate. They do not have to be confirmed in my State. Do they have to be confirmed in the State of Missouri?

Mr. Clarke of Missouri: "It so happens that they do have to be confirmed in my State, but it seems to me to make no difference whether they have to be confirmed or not, because, in my opinion, there is no basis for a distinction."

This colloquy shows that the only discussion, when the amendment striking exception 3 was before the Senate, concerned Mr. Clarke's fear of the political evil of wasting funds through political activities, and the coercion of individual state employees by state officers. As pointed out above, Illinois has strict laws prohibiting such activities and such coercion. While the Senate denied the right to a State to permit political activity on the State level, it saw fit to grant the right on the National level. While this discussion was taking place, no constitutional lawyer in the Senate stood up to remind Mr. Clarke of Section 4 of Article IV of the Constitution.

"Section 4. The United States shall guarantee to every State in this Union a Republican form of government * * *.",

nor did any one tell him that this defined the limits of the United States in so far as its dealings with the States was concerned; nor did any one call to his attention or to the attention of the Senate the decision of the Supreme Court in the case of Cummings v. State of Missouri, supra, which said, at 318ff, speaking of his own State of Missouri:

"But, as it was observed by the learned counsel who appeared on behalf of the State of Missouri, this Court cannot decide the case upon the justice or hardship of these provisions. Its duty is to determine whether they are in conflict with the Constitution of the United States. * * * We admit the propositions

of the counsel of Missouri, that the States which existed previous to the adoption of the Federal Constitution possessed originally all the attributes of sovereignty; that they still retain those attributes, except as they have been surrendered by the formation of the Constitution, and the Amendments thereto; that the new States, upon their admission into the Union, became invested with equal rights, and were thereafter subject only to similar restrictions, and that among the rights reserved to the States is the right of each State to determine the qualifications for office, and the conditions upon which its citizens may exercise their various callings and pursuits within its jurisdiction * * *

"Qualifications relate to the fitness or capacity of the party for a particular pursuit or profession. Webster defines the term to mean 'any natural endowment or any acquirement which fits a person for a place, office, or employment, or enables him to sustain any character, with success.' It is evident from the nature of the pursuits and professions of the parties, placed under disabilities by the Constitution of Missouri, that many of the acts, from the taint of which they must purge themselves, have no possible relation to their fitness for those pursuits and professions * * *

"The learned counsel does not use these terms—life, liberty, and property—as comprehending every right known to the law. He does not include under liberty freedom from outrage on the feelings as well as restraints on the person. He does not include under property those estates which one may acquire in professions, though they are often the source of the highest emoluments and honors. The deprivation of any rights, civil or political, previously enjoyed, may be punishment, the circumstances attending and the causes of the deprivation determining this fact. Disqualification from office may be punishment, as in cases of convictions upon impeachment. Disqualification from the pursuits of a lawful avocation, or from positions of trust, or from the privilege of appearing in the courts, or acting as an executor * * * may also, and often has been, imposed as punishment * * *.

" 'Some punishments,' says Blackstone, 'consist in exile or banishment * * * others induce a disability of holding offices or employments * * * and the like.' 4 Bl. 377 * * * ",

Nor did any one call to his attention United States v. Butler, 297 U.S. 1, 68, 56 S. Ct. 312, 320, 80 L.Ed. 477:

"It is an established principle that the attainment of a prohibited end may not be accomplished under the pretext of the exertion of powers which are granted * * *. The power of taxation, which is expressly granted, may, of course, be adopted as a means to carry into operation another power also expressly granted. But resort to the taxing power to effectuate an end which is not legitimate, not within the scope of the Constitution, is obviously inadmissible.

" 'Congress is not empowered to tax for those purposes which are within the exclusive province of the states'. Gibbons v. Ogden, 9 Wheat. 1, 199. 'There are, indeed, certain virtual limitations arising from the principles of the Constitution itself. It would undoubtedly be an abuse of the [taxing] power if so exercised as to impair the separate existence and independent self-government of the States or if exercised for ends inconsistent with the limited grants of power in the Constitution.' Veazie Bank v. Fenno, 8 Wall. 533, 541.

Nor did any one call to his attention that his own State, Missouri, was a sovereignty complete within its own jurisdic-

tion; nor did any one remind him or call to his attention that the Constitution of Missouri, whereby the people of Missouri organized a State government, was the supreme law of Missouri, or that it was the source of power within the limits of its borders that created three separate departments of state government free from the interference of the United States in matters concerning its own internal affairs, all guaranteed by Article IV, Sec. 4, of the United States Constitution; nor did any one call to his attention the decisions of the United States Supreme Court in the cases of McCulloch v. State of Maryland, 1819, 4 Wheat. 316, 430, 4 L.Ed. 579; State of Texas v. White, 1868, 7 Wall. 700, 725, 19 L.Ed. 227; Lane County v. State of Oregon, 1868, 7 Wall. 71, 19 L.Ed. 101; Collector v. Day, 1870, 11 Wall. 113, 125, 126, 20 L.Ed. 122; United States v. Baltimore & O. Railroad Co., 1872, 17 Wall. 322, 329, 21 L.Ed. 597; Pollock v. Farmers' Loan & Trust Co., 1895, 157 U.S. 429, 586, 15 S.Ct. 673, 39 L.Ed. 759; State of South Carolina v. United States, 1905, 199 U.S. 437, 454, 26 S.Ct. 110, 50 L.Ed. 261, 267; Farmers' & Mechanics' Sav. Bank of Minneapolis v. State of Minnesota, 1914, 232 U.S. 516, 526, 34 S.Ct. 354, 58 L.Ed. 706; Indian Motorcycle Co. v. United States, 1931, 283 U.S. 570, 575 et seq., 51 S.Ct. 601, 75 L.Ed. 1277; United States v. Constantine, 1935, 296 U.S. 287, 56 S.Ct. 223, 80 L.Ed. 233, and United States v. Butler, 1936, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477.

This brings us to the crux of the question as to whether or not the Congress can require the General Assembly of Illinois to pass a law requiring qualifications for a State office when it wills otherwise, or further stated, does Congress have the power to withhold funds to force such a qualification under its own power, when Illinois has already spent the contracted funds in derogation of its own revenue. It is only the Hatch Act, not Pittman-Robertson, Dingell-Johnson, or Clarke-McNary Acts, that so provide for the political position in question. The

answer of the Civil Service Commission is that the Oklahoma case so decides.

The factual situation in the Oklahoma case did not involve the question of contracts legally entered into, or the withholding of funds on completed contracts, provided the State officer was not discharged in 30 days as the Commission must under the Hatch Act so certify to the Federal Agency, which is then required to withhold from the State of Illinois, funds equivalent to two years' annual salary, $24,000 as above pointed out.

In Oklahoma, the Court says [330 U.S. 127, 143, 67 S.Ct. 553]: "While the United States is not concerned with, and has no power to regulate, local political activities as such of state officials, it does have power to fix the terms upon which its money allotments to states shall be disbursed." There is no citation of Constitutional authority to this proposition. The statement, "it does have power to fix the terms upon which its money allotments to states shall be disbursed", is not tested to inquire into the extent of the power. There is no question that Congress has the power to levy the tax and to make the appropriations, as provided by the three acts in question, Dingell-Johnson, Pittman-Robertson and Clarke-McNary; nor is there any doubt that Congress has the power to watch over the funds, all as provided under these three acts and the rules enacted thereunder, all of which have been complied with as the record herein shows. The question is whether or not there is a constitutional limitation that prevents Congress from enacting the Hatch Act sections in question. Undoubtedly there is power in Congress to pass the Act as to federal employees, and as to certain federal officials, and this power comes from Congressional prerogatives to pass laws for the running of the Federal government, all as granted under Article 1, Sec. 1, of the Federal Constitution. However, this power is qualified by the provision of the Federal Constitution requiring the United States to guarantee to each State a Republican form of government.

The question is whether or not there is a reasonable constitutional limitation that prevents Congress from enacting a law, in this instance Sec. 12 of the Hatch Act concerning State officers, to the extent that it can indirectly control the hiring or firing, and the appointment, recalling or discharging of a State officer contrary to the provisions of Illinois law, duly enacted by the Illinois General Assembly under its State constitutional authority. The court in Oklahoma says, "The Tenth Amendment does not forbid the exercise of this power in the way that Congress has proceeded in this case. As pointed out in United States v. Darby, 312 U.S. 100, 124, 657, 61 S.Ct. 451, 462, 85 L.Ed. 609, 132 A.L.R. 1430, the Tenth Amendment has been consistently construed 'as not depriving the national government of authority to resort to all means for the exercise of a granted power which are appropriate and plainly adapted to the permitted end.' The end sought by Congress through the Hatch Act is better public service by requiring those who administer funds for national needs to abstain from active political partisanship. So even though the action taken by Congress does have effect upon certain activities within the state, it has never been thought that such effect made the federal act invalid."

To this proposition the court cites Veazie Bank v. Fenno, 8 Wall. 533, 547, 75 U.S. 533, 547, 19 L.Ed. 482; Stearns v. State of Minnesota, 179 U.S. 223, 21 S.Ct. 73, 81, 45 L.Ed. 162; State of Florida v. Mellon, 273 U.S. 12, 47 S.Ct. 265, 71 L.Ed. 511; Helvering v. Therrell, 303 U.S. 218, 58 S.Ct. 539, 82 L.Ed. 758; Wright v. Union Central Life Ins. Co., 304 U.S. 502, 516, 58 S.Ct. 1025, 1033, 82 L.Ed. 1490, and Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 338, 56 S.Ct. 466, 479, 80 L.Ed. 688.

In United States v. Darby, supra, the Constitutional power was found to exist under the Commerce clause of the Constitution, and it was from this source that the power was exerted. In Veazie Bank v. Fenno, supra, the power to levy the tax was found to exist under the Taxing Clause. The corporation against which the tax was levied was a private state banking corporation, incorporated under State law, and the tax was levied against a state bank note. The certain activity within the State was not the State itself, or any political subdivision thereof. In Stearns v. State Bank of Minnesota, the basis was found under the Contract Impairment Clause of the Constitution and the Clause authorizing the United States to dispose of its property. The corporation involved was a private railroad corporation.

In the Veazie Bank case, the Court states, at page 541 of 75 U.S., in speaking of constitutional power:

"There are, indeed, certain virtual limitations, arising from the principles of the Constitution itself. It would undoubtedly be an abuse of the power if so exercised as to impair the separate existence and independent self government (County of Lane v. [State of] Oregon [7 Wall. 73, 19 L.Ed. 101]) of the States, or if exercised for ends inconsistent with the limited grants of power in the Constitution."

In the Stearns case, the Court states:

"That these provisions of the enabling act and the constitution, in form at least, made a compact between the United States and the State, is evident. In an inquiry as to the validity of such a compact this distinction must at the outset be noticed. There may be agreements or compacts attempted to be entered into between two States, or between a state and the nation, in reference to political rights and obligations, and there may be those solely in reference to property belonging to one or the other. That different considerations may underlie the question as to validity of these two kinds of compacts or agreements is obvious. It has often been said that a State admitted into the Union enters therein in full equality with all the others, and such equality may forbid any agreement or compact.

limiting or qualifying political rights and obligations." 179 U.S. 223, 244, 21 S.Ct. 73, 81, 45 L.Ed. 162, 174.

In State of Florida v. Mellon, the court refused to take jurisdiction on the ground that the Federal Estate Tax Act was uniform and constitutional under the Taxing Clause of the Federal Constitution. The power to act in Wright v. Union Central Life Insurance Co. was found to exist under the Bankruptcy Clause. In Ashwander v. Tennessee Valley Authority, the power to act was found to exist under the War and Commerce clauses and under the disposition of property clause. Under each of these decisions constitutional power existed under a specific clause of the Constitution. In this latter case the Court at page 326 of 297 U.S., at page 473 of 56 S.Ct. reiterated the proposition announced in McCulloch v. State of Maryland, that Congress may not,

"under the pretext of executing its powers, pass laws for the accomplishment of objects not entrusted to the government." 4 Wheat. 316, 423, 4 L.Ed. 579.

In Oklahoma, the Court further said [330 U.S. 127, at page 143, 67 S.Ct. 554], "A hearing was had, conformable to § 12, and the conclusion was reached that Mr. Paris' active participation in politics justified his removal from membership on the Highway Commission. Oklahoma chose not to remove him. We do not see any violation of the state's sovereignty in the hearing or order. Oklahoma adopted the 'simple expedient' of not yielding to what she urges is federal coercion. Compare Massachusetts v. Mellon, 262 U.S. 447, 482. [43 S.Ct. 597, 599, 67 L.Ed. 1078]." This last cited case was an attempt on the part of Massachusetts in which the state sought to enjoin the spending of federal moneys appropriated under the Maternity Act. The basis for disposing of the questions raised was that the two cases involved must be dismissed for want of jurisdiction, without considering the merits of the constitutional question, on the grounds that no

justiciable controversy was presented by Massachusetts, and that Frothingham the co-plaintiff, had no such interest in the subject matter, nor was any such injury inflicted or threatened, as enabled her to sue. The court pointed out the jurisdictional line of demarcation. This is particularly pointed out in United States v. Butler, 297 U.S. 1, 57, 56 S.Ct. 312, 315, 316, 80 L.Ed. 477, where the court said,

"Massachusetts v. Mellon, 262 U. S. 447 [43 S.Ct. 597, 67 L.Ed. 1078], is claimed to foreclose litigation by the respondents or other taxpayers, as such, looking to restraint of the expenditure of government funds. That case might be an authority in the petitioners' favor if we were here concerned merely with a suit by a taxpayer to restrain the expenditure of the public moneys. It was there held that a taxpayer of the United States may not question expenditures from its treasury on the ground that the alleged unlawful diversion will deplete the public funds and thus increase the burden of future taxation. Obviously the asserted interest of a taxpayer in the federal government's funds and the supposed increase of the future burden of taxation is minute and indeterminable. But here the respondents who are called upon to pay moneys as taxes, resist the exaction as a step in an unauthorized plan. This circumstance clearly distinguishes the case. * * *."

Here the State and the State officer, as pointed out in State of Oklahoma v. United States Civil Service Commission, have the interest to raise the question. The statement is made concerning the simple expedient of not yielding. In the instant case, Illinois has yielded within the limits of her full constitutional power by complying with every standard laid down by the three acts in question. One can see from reading the opinion that the power to enact the act and make the expenditure was given by the taxing power of the Constitution, in Commonwealth

of Massachusetts v. Mellon, supra. In Steward Machine Co. v. Davis, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279, the State of Alabama had complied with the terms of the Social Security Act, just as Illinois in the instant case has complied with the provisions of the three acts here involved. The court, in holding that a tax could be levied, found the power to levy the tax under the taxing clause of the Constitution. Specifically the court held as follows,

"First. The tax, which is described in the statute as an excise, is laid with uniformity throughout the United States as a duty, an impost or an excise upon the relation of employment." 301 U.S. 548, 578, 57 S.Ct. 883, 887.

"Second. The excise is not invalid under the provisions of the Fifth Amendment by force of its exemptions." 301 U.S. 548, 583, 57 S.Ct. 883, 889.

"Third. The excise is not void as involving the coercion of the States in contravention of the Tenth Amendment or of restrictions implicit in our federal form of government." 301 U.S. 548, 585, 57 S.Ct. 883, 890.

"Fourth. The statute does not call for a surrender by the states of powers essential to their quasi-sovereign existence." 301 U.S. 548, 593, 57 S.Ct. 883, 893.

No such questions are raised in the instant case. In fact, Illinois has joined with Congress under the respective acts of cooperation as above pointed out. It is pertinent to point out here that the Court said, at page 597 of 301 U.S., at page 895 of 57 S.Ct., concerning acts of cooperation:

"The inference of abdication thus dissolves in thinnest air when the deposit is conceived of as dependent upon a statutory consent, and not upon a contract effective to create a duty. By this we do not intimate that the conclusion would be different if a contract were dis-

covered. Even sovereigns may contract without derogating from their sovereignty * * * The states are at liberty, upon obtaining the consent of Congress, to make agreements with one another * * * We find no room for doubt that they may do the like with Congress if the essence of their statehood is maintained without impairment." 301 U.S. 548, 597, 57 S.Ct. 883, 895.

As above pointed out the Hatch Act strikes at disqualification of a state officer, appointed by the Governor and confirmed by the Illinois State Senate, with no power under Illinois law to disqualify the state officer for the reason assigned in the Hatch Act.

In United States v. Bekins, 304 U.S. 27, 58 S.Ct. 811, 82 L.Ed. 1137, the power exerted existed under the Bankruptcy Clause of the Constitution. The State consented that individual taxing bodies could file a petition in bankruptcy. The Court said,

"Third. We are thus brought to the inquiry whether the exercise of the federal bankruptcy power in dealing with a composition of the debts of the irrigation district, upon its voluntary application and with the State's consent, must be deemed to be an unconstitutional interference with the essential independence of the State as preserved by the Constitution.

"In Ashton v. Cameron County District, supra [298 U.S. 513, 56 S.Ct. 892, 80 L.Ed. 1309], the court considered that the provisions of Chapter 9 [11 U.S.C.A. § 301 et seq.] authorizing the bankruptcy court to entertain proceedings for the 'readjustment of the debts' of 'political subdivisions' of a State 'might materially restrict its control over its fiscal affairs,' and was therefore invalid; that if obligations of States or their political subdivisions might be subjected to the interference contemplated by Chapter IX, they would no longer be "free to manage their own affairs.""

"In enacting Chapter X the Congress was especially solicitous to afford no ground for this objection. In the report of the Committee on the Judiciary of the House of Representatives, which was adopted by the Senate Committee on the Judiciary, in dealing with the bill proposing to enact Chapter X, the subject was carefully considered. The Committee said:

" 'Compositions are approvable only when the districts or agencies file voluntary proceedings in courts of bankruptcy, accompanied by plans approved by 51 per cent of all the creditors of the district or agency, and by evidence of good faith. Each proceeding is subject to ample notice to creditors, thorough hearings, complete investigations, and appeals from interlocutory and final decrees. The plan of composition cannot be confirmed unless accepted in writing by creditors holding at least 66⅔ percent of the aggregate amount of the indebtedness of the petitioning district or taxing agency, and unless the judge is satisfied that the taxing district is authorized by law to carry out the plan, and until a specific finding by the court that the plan of composition is fair, equitable, and for the best interests of the creditors. * * *

" 'The Committee on the Judiciary is not unmindful of the sweeping character of the holding of the Supreme Court above referred to [in the Ashton case], and believes that H. R. 5969 is not invalid or contrary to the reasoning of the majority opinion. * * *

" 'The bill here recommended for passage expressly avoids any restriction on the powers of the States or their arms of government in the exercise of their sovereign rights and duties. No interference with the fiscal or governmental affairs of a political subdivision is permitted. The taxing agency itself is the only instrumentality which can seek the benefits of the proposed legislation. No involuntary proceedings are allowable, and no control or jurisdiction over that property and those revenues of the petitioning agency necessary for essential governmental purposes is conferred by the bill. * * *

" 'There is no hope for relief through statutes enacted by the States, because the Constitution forbids the passing of State laws impairing the obligations of existing contracts. Therefore, relief must come from Congress, if at all. * * * It is the opinion of the committee that the present bill removes the objections to the unconstitutional statute, and gives a forum to enable those distressed taxing agencies which desire to adjust their obligations and which are capable of reorganization, to meet their creditors under necessary judicial control and guidance and free from coercion, and to affect such adjustment on a plan determined to be mutually advantageous.'

"We are of the opinion that the Committee's points are well taken and that Chapter X is a valid enactment. The statute is carefully drawn so as not to impinge upon the sovereignty of the State. The State retains control of its fiscal affairs. The bankruptcy power is exercised in relation to a matter normally within its province and only in a case where the action of the taxing agency in carrying out a plan of composition approved by the bankruptcy court is authorized by state law. It is of the essence of sovereignty to be able to make contracts and give consents bearing upon the exertion of governmental power." 304 U.S. 27, 49, 58 S.Ct. 811, 814.

Thus the rule announced in Ashton v. Cameron County District, 298 U.S. 513, 56 S.Ct. 892, 80 L.Ed. 1309, is the law on questions that affect state sovereignty

concerning the power of the United States as granted in the Constitution, or that a source of power must be found therein to permit congressional action. The Court said, at pages 528ff of 298 U. S., at pages 895, 896 of 56 S.Ct.:

"The pertinent doctrine, now firmly established, was stated through Mr. Chief Justice Chase in Texas v. White, 7 Wall. 700, 725:

" 'We have already had occasion to remark at this term, that "the people of each State compose a State, having its own government, and endowed with all the functions essential to separate and independent existence;" and that 'without the States in union, there could be no such political body as the United States.' Not only, therefore, can there be no loss of separate and independent autonomy to the States, through their union under the Constitution, but it may be not unreasonably said that the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National government. The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States."

Collector v. Day, 11 Wall. 113, 125, 126:

" 'Such being the separate and independent condition of the States in our complex system, as recognized by the Constitution, and the existence of which is so indispensable, that, without them, the general government itself would disappear from the family of nations, it would seem to follow, as a reasonable, if not a necessary consequence, that the means and instrumentalities employed for carrying on the operations of their governments, for preserving their existence, and fulfilling the high and responsible duties assigned to them in the Constitution, should be left free and unimpaired; should not be liable to be crippled, much less defeated by the taxing power of another government, which power acknowledges no limits but the will of the legislative body imposing the tax. And, more especially, those means and instrumentalities which are the creation of their sovereign and reserved rights, one of which is the establishment of the judicial department, and the appointment of officers to administer their laws. Without this power, and the exercise of it, we risk nothing in saying that no one of the States under the form of government guaranteed by the Constitution could long preserve its existence.'

"In Indian Motorcycle Co. v. United States, 283 U.S. 570, 575, et seq., [51 S.Ct. 601, 75 L.Ed. 1277], relevant cases are collected and the following conclusion announced—

" 'This principle is implied from the independence of the national and state governments within their respective spheres and from the provisions of the Constitution which look to the maintenance of the dual system.'

"Notwithstanding the broad grant of power 'to lay and collect taxes,' opinions here plainly show that Congress could not levy any tax on the bonds issued by the respondent or upon income derived therefrom. So to do would be an unwarranted interference with fiscal matters of the State—essentials to her existence. Many opinions explain and support this view. * * "

"The power 'To establish * * uniform Laws on the subject of Bankruptcies' can have no higher rank or importance in our scheme of government than the power 'to lay and collect taxes.' Both are granted by the same section of the Constitution, and we find no reason for saying that one is impliedly limited by the necessity of preserving independence of the States, while the other is not. * * *

"Neither consent nor submission by the States can enlarge the powers of Congress; none can exist except those which are granted. United States v. Butler, decided January 6, 1936, 297 U.S. 1 [56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914]. The sovereignty of the State essential to its proper functioning under the Federal Constitution cannot be surrendered; it cannot be taken away by any form of legislation. See United States v. Constantine, 296 U.S. 287 [56 S.Ct. 223, 80 L.Ed. 233] * * *.

"The difficulties arising out of our dual form of government, and the opportunities for differing opinions concerning the relative rights of State and National Governments are many; but for a very long time this court has steadfastly adhered to the doctrine that the taxing power of Congress does not extend to the States or their political subdivisions. The same basic reasoning which leads to that conclusion, we think, requires like limitation upon the power which springs from the bankruptcy clause. United States v. Butler, supra."

It is to be noted also that the taxes provided under the Pittman-Robertson Act and under the Dingell-Johnson Act are not, strictly speaking, taxes or duties within the meaning of the Constitution. See Sections 669b, 669b–1, 669c, 777b, Title 16 U.S.C.A. Under Section 669b "an amount equal to the revenue accruing * * * on firearms, shells, and cartridges," Section 4181, Title 26 U.S.C.A., is authorized to be set apart in the Treasury as a special fund to be known as "Federal aid to wildlife—restoration fund" to be used under Section 669 in accordance with cooperation agreements; and under Section 777b, "there is authorized to be appropriated an amount equal to the revenue accruing from tax imposed by Section 3406 [4161] of Title 26 on fishing rods, creels, reels, and artificial lures, baits, and flies," to be used under Section 777 in accordance with cooperation agreements with the states. The money thus raised, though paid into the Treasury, is appropriated in advance to the uses of these statutes, and does not go to the general support of the Federal Government. Edye v. Robertson, 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798, 803; United States v. Butler, 297 U.S. 1, 60, 56 S.Ct. 312, 316, 80 L.Ed. 477. The theory of these acts is to afford to the states aid in the various projects within the internal borders of the states, enumerated by these statutes as in this record shown. The sections of the Hatch Act in question seem to be directed to the end, under the guise of federal appropriation and spending, of attempting to regulate matters wholly within and instrumentalities and officers of the State of Illinois that are necessary to running the Department of Conservation, which is in fact the State of Illinois.

It is plain then that the power asserted in Oklahoma did not spring from the taxing clause. The power of the Congress to pass the Hatch Act, applied to federal employees, springs from the reasonably implied power to regulate and pass laws for the running and perpetuation of the Federal Government. Likewise this same power exists in the State government, and in the exercise of these powers, neither can impose its will on the other, by law or otherwise. Thus inquiry having been fully made, there can be found no authority or power conferred in the Constitution that authorizes the application of the Hatch Act to state officers, nor can there be found any constitutional authority that permits Congress to withhold money due under contracts of cooperation entered into under permission of laws mutually enacted for the benefit of the other. It is further the law that what one state cannot do directly, cannot be done indirectly in so far as the internal affairs of the individual state are concerned without its consent, which Illinois by its legislative body has not given. The Department of Conservation is roughly comparable to the Department of the Interior. Both

are essential departments of the respective state and national governments. Both must be supported by taxation raised through the respective taxing powers of both governments; and to say that the Congress can provide a qualification for a state officer contrary to the specific provisions of the Constitution and laws of Illinois, under the law and facts as herein set out, would amount to destruction of principles of constitutional government as we have known it from the time of the creation of the Constitution, thereby reducing Illinois to a mere geographical division of the Federal government. The Congress has never been permitted, by the Supreme Court, to pass laws that have no foundation in constitutional powers, which are not either expressly granted or reasonably implied from the powers expressly granted.

It is true that a state may consent to a surrender of constitutional power. This is known as the doctrine of consent. The consent must come from the power of the legislative department of state government having the right to give the consent, as, for example, consent to surrender a fiscal power, such as was done in the case of United States v. Bekins, supra. There the legislature of California had the power to deal with fiscal affairs of the taxing body. This is also permitted under acts of cooperation because the State legislative body has the power to deal with the surrender of legislative power. The legislative body also has the right to control state employees because they come within the right, as likewise the qualifications of state officers where the Constitution of Illinois has not so provided. There has been no consent here. The doctrine of waiver of the constitutional rights and prerogatives has never been applied to the sovereignty of a state. In fact, in the absence of consent, the rule is otherwise. This rule of constitutional law is announced in 11 Am.Jur., Sec. 170, p. 864, as follows:

"The original thirteen states existed prior to the adoption of the Federal Constitution and before that time possessed all the attributes of sovereignty. All these attributes except those surrendered by the formation of the Constitution, and the Amendments thereto, have been retained. New states, upon their admission into the Union, became invested with equal rights and are subject only to such restrictions as are imposed on the States already admitted. There can be no state of the Union whose sovereignty or freedom of action is in any respect different from that of any other state. There can be no restriction on any state other than one prescribed upon all the states by the Federal Constitution. Congress, in admitting a state, cannot restrict such state by bargain. The state by so contracting with Congress is in no wise bound by such a contract however irrevocable it is stated to be. It is said that subject to the restraint and limitations of the Federal Constitution, the states have all the sovereign powers of independent nations over all persons and things within their respective territorial limits."

It is pertinent, as to the existence of any such power, to point out what the court said in one of these last cited cases, Collector v. Day, 11 Wall. 113, 125, 126, 20 L.Ed. 122:

"Such being the separate and independent condition of the States in our complex system, as recognized by the Constitution, that without them, the general government itself would disappear from the family of nations, it would seem to follow, as a reasonable, if not necessary consequence, that the means and instrumentalities employed for carrying on the operations of their governments, for preserving their existence, and fulfilling the high and responsible duties assigned to them in the Constitution, should be left free and unimpaired, should not be liable to be crippled, much less defeated by

the taxing power of another government, which power acknowledges no limits but the will of the legislative body imposing the tax. And, more especially, those means and instrumentalities which are the creation of their sovereign and reserved rights, one of which is the establishment of the judicial department, and the appointment of officers to administer their laws. Without this power, and the exercise of it, we risk nothing in saying that no one of the States under the form of government guaranteed by the Constitution could long preserve its existence."

It is also pertinent here to take note of the fact that Mr. Clarke had this to say:

"I do not believe there is any rhyme or reason in excepting such employees from the operation of the law,"

and in response to Mr. Minton's question:

"Does the Senator see any reason why anybody should be excepted? Why should we except the Governor?",

Mr. Clarke had this to say:

"The Governor has been elected by the people of the State, and I can see a reason for exempting him. I can also see a reason for the second exception, (elected heads of any executive departments of any state) * * * To say that a man who is elected by the people of a State shall have a right to appeal to the people of a State whenever he sees fit is one thing. To say that other officials appointed by the Governor * * * is an entirely different thing,"

and further,

"I say there is an essential difference between those who are elected by the people, and those who are appointed * * *",

and further,

" * * * it seems to me to make no difference whether they have to be confirmed or not, because, in my opinion, there is no basis for a distinction."

It is apparent from what Mr. Clarke said that he (1) regarded a state senate confirmed officer the same as an employee, (2) that state and federal constitutional questions never entered into the discussion, (3) that even the Governor of a State was subject to Congressional action in regard to the matter under consideration, and (4) that it was felt "that no limits" governed the enactment "but the will of the legislative body." As to Point 1, the Constitution of Illinois provides the distinction under Article V, Section 24, I.R.S.1959, p. 15, when it says:

"An office is a public position created by the constitution or law, continuing during the pleasure of the appointing power, or for a fixed time, with a successor elected or appointed. An employment is an agency, for a temporary purpose, which ceases when that purpose is accomplished."

Thus as to this point there is a distinction, and the distinction covers both, whether elected or appointed officers, as being State officers and employees. Thus under the Constitution of Illinois there should have been a distinction, but the Illinois Constitution was never considered when the Act in question was before the Senate. As to 2, it has previously been pointed out that the Governor of Illinois, in his office, is the supreme executive power of Illinois, as the President is the supreme executive power of the United States, and as Illinois in its own internal affairs is a sovereign state, free from the trammel or duress of any one, even the Congress, as is the National government in the exercise of its powers, the same rule of law governs both in the dealings with each other, as the Supreme Court of the United States has on numerous occasions so decided as herein pointed out; and that the acts of the executive officers appointed by the Governor are in effect the acts of the Governor, just the same as the

acts of the executive officers under the executive power of the United States, the acts of the President.

This has definitely been decided by the Supreme Court in Marbury v. Madison, 1 Cranch 137, 166, 2 L.Ed. 60, 70.

The Court in this case further said, 1 Cranch at page 165:

"By the constitution of the United States, the president is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience. To aid him in the performance of these duties, he is authorized to appoint certain officers, who act by his authority, and in conformity with his orders. In such cases, their acts are his acts; and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion. The subjects are political: they respect the nation, not individual rights, and being entrusted to the executive, the decision of the executive is conclusive. The application of this remark will be perceived, by adverting to the act of congress for establishing the department of foreign affairs. This officer, as his duties were prescribed by that act, is to conform precisely to the will of the president: he is the mere organ by whom that will is communicated. The acts of such an officer, as an officer, can never be examinable by the courts."

Use all the above language, but in lieu of the words "President", and "Secretary of State", insert the words "Governor" and "Director of Conservation", and one can only reach the conclusion that the Director of Conservation in all his political acts, is the Governor or the agent for the Governor acting for him, and in his capacity he is subject to no authority but that of the Governor. If Illinois is to exist as a free and independent State in the exercise of its internal affairs, it must have a Governor, and to say that Congress has the right to provide laws for his removal or suspension in the conduct of the legal internal affairs of Illinois is to say that Illinois is no longer a free and independent State. I believe that when Congress passed the Illinois Admission Act, approved Dec. 3, 1818, 3 Stat. 536, when it said:

"Resolved by the Senate and House of Representatives of the United States of America, in Congress assembled * * * the people of said territory did, on the twenty-sixth day of August in the present year by a convention called for that purpose form for themselves a constitution and state government which constitution and state government, so formed, is Republican, and in conformity to the principles of the articles of compact between the original states and the people and states in the territory north west of the river Ohio, passed on the thirteenth day of July, one thousand seven hundred and eighty-seven: Resolved, by the Senate and House of Representatives of the United States of America, in Congress assembled, That the state of Illinois shall be one, and is hereby declared to be one, of the United States of America, and admitted into the Union on an equal footing with the original states, in all respects whatever,"

it meant to create Illinois an independent state with all others, and that when this occurred the only power left in Congress concerning the regulation of its own internal political affairs ceased under Article IV, Section 4 of the United States Constitution, and that the Act of Admission, approving the Illinois Constitution and granting statehood, placed the Illinois Constitution beyond the powers of Congress to alter or strike down the Constitution and republican form of government found to exist by the passage of the Act in so far as the internal political affairs of Illinois are concerned; and that

the purpose of Section 12(a) of the Hatch Act is to either directly or indirectly accomplish this purpose, because when by its specific terms it points to the executive department of state government authorized to determine policies of State government by Illinois Constitution and laws, it attempts to determine the internal political affairs of Illinois, those which can only be determined by the Governor, who is answerable only to his State, and to his own conscience. It strikes one making an intense study of what has been said about the powers of the State and Federal governments, that no person, the President, the Congress, the Judiciary, the Governor or the State Legislatures can destroy the State government or pass any law that strikes at an executive department of either the State or National governments. Historically a civil war was endured to preserve the Union and the State governments, and Mr. Justice Marshall said, concerning the integrity of State government in M'Culloch v. State of Maryland, 4 Wheat. 316, 403, 4 L.Ed. 579, 600:

"No political dreamer was ever wild enough to think of breaking down the lines which separate the states, and of compounding the American people into one common mass."

It appears that if Congress can directly or indirectly prescribe or attempt to prescribe the qualifications of a state officer, or attempt to exert power directly or indirectly against an executive officer in charge of an executive branch of state government, or attempt to strike at penalizing state funds raised through State revenues, as this record shows, then the prophetic statement which Marshall believed to be untrue, has come true, and Congress has the power to make the States mere geographical divisions of the National government. Thus it can readily be seen that the Hatch Act, when it points to the executive departments under the Governor, strikes at the supreme executive authority of Illinois, and this it cannot do any more than it could strike at the supreme executive authority of the United States, the Presidency; and as to points 3 and 4 which also come under and are fully elaborated under point 2, the executive power of the State is thus subjected to the will of the Congress subject to no limits except the will of the legislative body. The Congress is not a parliament of the people. It is a separate branch of the Federal government, and it secures its power from only one source, the Constitution of the United States.

Examine the question in the light of cooperation as contemplated under the various acts here in question. The three acts here involved are framed on the theory that the states may follow the plan of cooperation by adopting state legislation enabling the states to cooperate. The Hatch Act is framed on the theory that it is within the power of Congress, not only to permit cooperation, but to tell the states that unless they cooperate in accordance with the legislative will, which, without constitutional limitations knows no end, that they cannot participate in the enjoyment of cooperative action. Now, for example, if the state does not follow this will yet enters into acts of cooperation, the State can either recall the state officer or suffer the loss of twice the annual salary of the officer after state money raised through its taxing power has already been spent with consent of the state legislature when it made the appropriation. If this power exists what is there to prevent a future Congress from saying that the withholding of funds shall be fifty, or a hundred times the state officer's salary? If the power exists Congress would have the right to so do. The closest, most analogous case to be found denies this right. It is the case of Lane County v. State of Oregon, 74 U.S. 71, 19 L.Ed. 101, 104, where the Supreme Court, speaking of taxing power, said:

"Now, to the existence of the states, themselves necessary to the existence of the United States, the power of taxation is indispensable. It is an essential function of govern-

ment. It was exercised by the Colonies; and when the Colonies became states, both before and after the formation of the Confederation, it was exercised by the new governments * * * The Constitution, it is true, greatly changed this condition of things. It gave the power to tax, both directly and indirectly, to the national government, and, subject to the one prohibition of any tax upon exports and to the conditions of uniformity in respect to indirect and of proportion in respect to direct taxes, the power was given without any express reservation. * * * In respect, however, to property, business, and persons, within their respective limits, their power of taxation remained and remains entire. It is indeed a concurrent power, and in the case of a tax on the same subject by both governments, the claim of the United States, as the supreme authority, must be preferred; but with this qualification it is absolute. The extent to which it shall be exercised, the subjects upon which it shall be exercised, and the mode in which it shall be exercised, are all equally within the discretion of the legislatures to which the States commit the exercise of the power. That discretion is restrained only by the will of the people expressed in the State constitutions or through elections, and by the condition that it must not be so used as to burden or embarrass the operations of the national government. There is nothing in the Constitution which contemplates or authorizes any direct abridgement of this power by national legislation. To the extent just indicated it is as complete in the States as the like power, within the limits of the Constitution, is complete in Congress."

Place this proposition against the Constitution of Illinois and consider that the Federal Agency is required to withhold from the State of Illinois, the sum of $24,000. First, the Constitution, Article IV, Section 17, provides: "No money shall be drawn from the treasury except in pursuance of an appropriation made by law"; this is the Illinois constitutional authority under which money from the Illinois Treasury was appropriated for use under the three federal acts above mentioned. Second, the same Article provides, "and no money shall be diverted from any appropriation made for any purpose, or taken from any fund whatever, either by joint or separate resolution. The auditor shall * * * prepare and publish a full statement of all money expended at such session, specifying the amount of each item, and to whom and for what paid", and this is the Illinois Constitutional provision that authorized the spending of State of Illinois moneys under the projects for which the money was spent under the cooperation provisions of the three Federal Acts. It was contemplated under the respective laws of the State and National governments that a portion of the money would be repaid into the State Treasury, and as the record in this case shows, a sum approximating a portion equal to 6.3 per cent. Now if $24,000 is withheld from the State, the State Treasury will end short that amount, for the constitutional provision provides, "and no money shall be diverted from any appropriation made for any purpose, or taken from any fund whatever, either by joint or separate resolution." Thus, the effect of the Hatch Act as sought to be applied in this case is to strike at a fund of Illinois levied and collected under Illinois Revenue laws from Illinois citizens and spent as provided by appropriation laws of Illinois, contrary to this constitutional provision. In the case of Boeing Aircraft Co. v. Reconstruction Finance Corp., 25 Wash.2d 652, 171 P.2d 838, 842, 168 A.L.R. 539, 543 and 544, appeal dismissed Boeing Aircraft Co. v. King County, 330 U.S. 803, 67 S.Ct. 972, 91 L.Ed. 1262, the Supreme Court of Washington said:

"In appellant's brief, we find the following:

" 'It is unthinkable that, under a system of government such as we have in the United States, a state may, by its laws or constitutional provisions, defeat the clearly expressed policy of Congress. The Supremacy Clause was intended to prevent such a result.'

"We cannot so hold, for to do so would effectively do away with the provisions of our state constitution by subjecting those provisions to be continually changed by acts of Congress. The constitution of the United States has not given that power to Congress, and Congress has only the powers expressly given it by the constitution of the United States. The American system of government is dual in nature, containing Federal and state sovereignties, each supreme within its appropriate sphere. The States do not get their power from the Federal government, but from the constitution of the United States. They exercise those powers independently of the Congress of the United States. The Federal government has no power to control the power or authority of the state except as such power may have been expressly granted, or as may be necessary to maintain the acknowledged powers of the Federal government. True, Congress may determine the circumstances under which a state may be admitted into the Union, but that does not give it any powers to change or modify either directly or indirectly, the provisions of the state constitution."

If this power to alter or change the plain meaning of a State Constitution existed in the Congress, then Congress could at will prevent a State from discharging its ordinary functions of government. Educational Films Corp. of America v. Ward, 282 U.S. 379, 391, 51 S.Ct. 170, 173, 75 L.Ed. 400; State of South Carolina v. United States, 199 U.S. 437, 454, 26 S.Ct. 110, 50 L.Ed. 261, 267, And in United States v. Butler, 297 U.S. 1, 74, 56 S.Ct. 312, 323, 80 L.Ed. 477, it is said:

"Congress has no power to enforce its commands on the farmer to the ends sought by the Agricultural Adjustment Act. It must follow that it may not indirectly accomplish those ends by taxing and spending to purchase compliance. The Constitution and the entire plan of our government negative any such use of the power to tax and to spend as the act undertakes to authorize. It does not help to declare that local conditions throughout the nation have created a situation of national concern; for this is but to say that whenever there is a widespread similarity of local conditions, Congress may ignore constitutional limitations upon its own powers and usurp those reserved to the states. If, in lieu of compulsory regulation of subjects within the states' reserved jurisdiction, which is prohibited, the Congress could invoke the taxing and spending power as a means to accomplish the same end, Clause 1 of Section 8 of Article I would become the instrument for total subversion of the governmental powers reserved to the individual states."

These matters have been pointed out because it appears from careful study of applicable constitutional principles that the real constitutional issue was never presented to the Court either by briefs and argument, or by law and factual matters as appear in this record. The Supreme Court in Oklahoma v. United States Civil Service Commission has said that the Act in question is constitutional, and this Court is bound thereby; but this Court believes that in the event this case is reviewed by a higher court, the matter in issue should be fully discussed for the purpose of enabling a reviewing court to have before it the full benefit of the constitutional principles involved.

However, the Oklahoma case leaves open the question of the constitutional rights of the state officer. Many of the things pointed out above can be applied factually to the Director of Conservation, Mr. Palmer, the respondent, who also appeals from the order of the Commis-

sion, and this is especially true as far as state law is concerned. These matters having been pointed out above, they will not be further stated.

The Constitution of the United States and of the State of Illinois protect the individual and his rights. The Fifth Amendment to the United States Constitution provides,

"No person shall * * * be deprived of life, liberty, or property, without due process of law * * ",

and the Illinois Constitution provides under Article II, Sections 1, 2, 19 and 20, that,

(1) "All men are by nature free and independent, and have certain inherent and inalienable rights—among these are life, liberty, and the pursuit of happiness. To secure these rights and the protection of property, governments are instituted among men, deriving their just powers from the consent of the governed.

(2) "No person shall be deprived of life, liberty or property, without due process of law."

(19) "Every person ought to find a certain remedy in the laws for all injuries and wrongs which he may receive in his person, property or reputation; he ought to obtain, by law, right and justice freely, and without being obliged to purchase it, completely and without denial, promptly, and without delay.

(20) "A frequent recurrence to the fundamental principles of civil government is absolutely necessary to preserve the blessings of liberty,"

and Article V, Section 10 provides:

(10) "The governor shall nominate, and by and with the advice and consent of the senate, (a majority of all the senators elected concurring, by yeas and nays) appoint all officers whose offices are established by this constitution, or which may be created by law, and whose appointment or election is not otherwise provided for; and no such officer shall be appointed or elected by the general assembly."

Under this latter provision and under and by virtue of Section 13, Chapt. 127, State Government, I.R.S.1959, the Director received the appointment as Director of Conservation of the State of Illinois for a term of two years; he was nominated by the Governor, confirmed by the Illinois State Senate, and his commission executed and delivered to him. When he accepted and assumed the duties of the office his commission was irrevocable for a period of two years. Under the above sections of the Constitution of the United States and of the State of Illinois, by this appointment, confirmation and acceptance, he had vested in him legal rights which are protected by the laws of his country; and for the United States Civil Service Commission under authority of Sections 12(a), et seq., of the Hatch Act to order a finding that he was engaged in activities that warranted the State of Illinois in removing him amounts to an act not warranted by law and which is violative of his vested legal rights.

The question of these legal rights was settled early by the Supreme Court of the United States in the case of Marbury v. Madison, 1 Cranch 137, 162, 2 L.Ed. 60, 70, where the Court said:

"Where an officer is removable at the will of the executive, the circumstance which completes his appointment is of no concern; because the act is at any time revocable; and the commission may be arrested, if still in the office. But when the officer is not removable at the will of the executive, the appointment is not revocable, and cannot be annulled: it has conferred legal rights which cannot be resumed. "The discretion of the executive is to be exercised, until the appointment has been made. But having once made the appointment, his power over the office is terminated, in all cases where, by law, the officer is not removable by him. The right to the office is then in the person appointed,

and he has the absolute unconditional power of accepting or rejecting it.

"Mr. Marbury then, since his commission was signed by the president, and sealed by the secretary of state, was appointed; and as the law creating the office gave the officer a right to hold for five years, independent of the executive, the appointment was not revocable, but vested in the officer legal rights, which are protected by the laws of his country. "To withhold his commission, therefore, is an act deemed by the court not warranted by law, but violative of a vested legal right."

If this be the law and the Chief Executive of the United States could not recall the issuance of the commission, then most certainly the legislative department, vesting such authority in the Civil Service Commission, could not order the discharge of a state officer, or even make a finding that his activity in a political party position permitted by the law of Illinois, warranted his discharge or recall for a period of eighteen months; and to carry the matter to its logical conclusion, the Congress of the United States has no authority to enact by law a provision for withholding from the State of Illinois a sum of money equivalent to $24,000, to accomplish this purpose.

▌ The only right to recall the State officer is for the reasons provided in Article V, Section 12 of the Illinois Constitution. These reasons do not exist in this record, and even if they did, the sole person who is to act in the matter is the Governor. Wilcox v. People ex rel. Lipe, 90 Ill. 186, 204. This case so holds. The courts of Illinois, under the State Constitution, cannot interfere. The State Constitution having been ratified and approved under the Illinois Admission Act by the Congress, the act of approval prohibits the Congress from any further action either directly or indirectly when the provision of the Illinois Constitution is not in conflict with any provision of the Federal Constitution. The courts of

the United States will follow the courts of Illinois in construing the provisions of the Illinois Constitution and laws. State of South Carolina v. United States, 199 U.S. 437, 454, 26 S.Ct. 110, 50 L.Ed. 261, 267; Williams v. State of Oklahoma, 358 U.S. 576, 583, 79 S.Ct. 421, 3 L.Ed.2d 516; Morey v. Doud, 354 U.S. 457, 470, 77 S.Ct. 1344, 1 L.Ed.2d 1485.

As pointed out in Marbury v. Madison, supra, the President, and in Illinois, the Governor have certain political powers in the exercise of which they can use their own discretion, and are accountable only to their country and state in their political character and to their own consciences. Speaking of the rights of individuals, the Supreme Court, in Cummings v. State of Missouri, 71 U.S. 277, at page 320, 18 L.Ed. 356, says:

" * * * We do not agree with the counsel of Missouri that 'to punish one is to deprive him of life, liberty, or property, and that to take from him anything less than these is no punishment at all.' The learned counsel does not use these terms— life, liberty, and property—as comprehending every right known to the law. He does not include under liberty freedom from outrage on the feelings as well as restraints on the person. He does not include under property those estates which one may acquire in professions, though they are often the source of the highest emoluments and honors. The deprivation of any rights, civil or political, previously enjoyed, may be punishment, the circumstances attending and the causes of the deprivation determining this fact. Disqualification from office may be punishment, as in cases of conviction upon impeachment. Disqualification from the pursuits of a lawful avocation, or from positions of trust, or from the privilege of appearing in the courts, or acting as an executor, administrator, or guardian, may also, and often has been, imposed as punishment. By statute 9 and 10 William III, chap.

32, if any person educated in or having made a profession of the Christian religion, did, 'by writing, printing, teaching, or advised speaking,' deny the truth of the religion, or the divine authority of the Scriptures, he was for the first offence rendered incapable to hold any office or place of trust. * * *

" 'Some punishments,' says Blackstone, 'consist in exile or banishment, by abjuration of the realm or transportation; others in loss of liberty by perpetual or temporary imprisonment. Some extend to confiscation by forfeiture of lands or movables, or both, or of the profits of lands for life; others induce a disability of holding offices or employments, being heirs, executors, and the like.'

"In France, deprivation or suspension of civil rights, or of some of them, and among these of the right of voting, of eligibility to office, * * * are punishments prescribed by her code.

"The theory upon which our political institutions rest is that all men have certain inalienable rights—that among these are life, liberty, and the pursuit of happiness; and that in the pursuit of happiness all avocations, all honors, all positions, are alike open to every one, and that in the protection of these rights all are equal before the law. * * *"

■ It follows that the respondent, Glen D. Palmer, is protected in these rights for all purposes as disclosed in this record under the Constitutions of the United States and of the State of Illinois, and to place him under recall or to withhold him from office under penalty to the State of having the Commission order the withholding of funds mutually and cooperatively provided for under the respective acts, both Federal and State, above mentioned simply because he holds a political party position, or is a member of a political committee, as permitted by Illinois law, is not within the law and

would violate his legal vested rights, all of which are guaranteed by both the Federal and State Constitutions as herein above mentioned.

None of the salary of Mr. Palmer, as a State officer, comes from Federal funds. Article IV, Section 16 of the Illinois State Constitution provides,

"The general assembly shall make no appropriation of money out of the treasury in any private law. Bills making appropriations for the pay of members and officers of the general assembly, and for the salaries of the officers of the government, shall contain no provision on any other subject."

His official pay was provided for the three terms of office of two years each by three appropriation bills passed by the Illinois General Assembly. These bills are "Senate Bills", Nos. 582, for the biennium beginning July 1, 1953, pp. 592, 595; Senate Bill No. 839 for the biennium beginning July 1, 1955, pp. 1277, 1280; and Senate Bill No. 715 for the biennium beginning July 1, 1957, pp. 999, 1003, all found in the Session Laws of Illinois for 1953, 1955 and 1957. These are all provided in Senate Bills entitled, "An Act making appropriations for the pay of officers and members of the General Assembly and certain officers of the State Government." The Act for each biennium is entitled the same. This is in accordance with Article IV, Sec. 16 above quoted. All other funds for the Department of Conservation, including those for cooperative purposes with the Federal Government, are appropriated under House Bill No. 717 for the biennium beginning July 1, 1953, Session Laws p. 313; Senate Bill No. 410 for the biennium beginning July 1, 1955; Session Laws, p. 323; Senate Bill No. 653 for the biennium beginning July 1, 1957, Session Laws, p. 892. The appropriations are made for state officers from the general revenue fund of Illinois, and from the Fish and Game Fund and General Revenue Fund for running the Department of Conservation as provided in the respective appropriation bills. It

thus appears that no federal funds are used to pay the Director of Conservation. It appears in this record that Illinois funds have been used to pay for the various projects in the first instance, and that although state funds have been so used in a cooperative project, a part thereof and a very small percentage of total funds appropriated to the Department of Conservation may be repaid by Federal Agencies, if and when approved by the federal agencies. Forestry is divorced from all other activities of the Department, and it is under the supervision of the State Forester who even must be approved by the Federal Agency before the State of Illinois can employ him for the position. It further appears from this record that during the six year period in question the General Assembly of Illinois appropriated and spent the total sum of $35,975,405.21; that the Federal Agencies have approved projects for which Illinois has been reimbursed in the sum of $2,263,661.20, or a total percentage reimbursement of 6.30. This record further shows the numerous and burdensome duties of the Director under State law; that practically all that the Director had to do with projects connected with Federal cooperative plans was to sign his name to documents to be sent to Federal Agencies, sign requests for reimbursement, and then transmit them to the State Auditor of Illinois for deposit in the Illinois State Treasury. The record here shows that the Director spent less than one per cent of his time in connection with projects involving federal aid to fish, game and wildlife, and no time in connection with forestry. It is a simple problem of arithmetic to thus conclude that less than 1/100 of his time, when divided into 6.3% of the refunded portion, would amount to less than .063% in relation to total activities financed in part with federal funds.

The United States Civil Service Commission has a rule that is known as the "Secondary Rule of Jurisdictional Limitation", based on the maxim "de minimis non curat lex". The examiner who heard this case recommended that this rule be followed, the Commission ruling otherwise. The Commission, in the Joseph L. Todd case, Docket #29, said, "the legal doctrine upon which the second rule rests is well recognized, but we shall cite several authorities." I quote the Commission as follows:

"There is a long discussion and grouping of authorities in Broom's Legal Maxims (1939 Ed., page 88, et seq.) from which we quote a brief excerpt:

" 'When trifling irregularities or even infractions of the law are brought under notice of the court, the maxim *de minimis non curat lex* is of frequent application. * * * The law permits the qualification implied in the ancient maxim * * If the deviation were a mere trifle, which, if continued in practice, *would weigh little or nothing in the* public interest, it might properly be overlooked.

" 'See also Love v. Spur School District, et al. [Tex.Civ.App.], 143 S.W. (2) 793; Elfer v. Hyberna [Hibernia] National Bank, et al. [La. App.] (1937), 174 So. 387 [287]; Hopkins v. Kitts, [37 Mont. 26], 94 Pac. 1013 [201]; Rose v. State (Cal. 1940), 105 Pac. (2nd) 302.

" 'In Bristol-Myers Co. v. Lit Brothers (1939) [336 Pa. 81], 6 Atl. (2) 843, the plaintiff sought an injunction against an alleged violation of a Pennsylvania statute which forbade "selling any commodity for less than the price stipulated by contract with the manufacturer". It was claimed that the defendant had violated such a contract with the plaintiff in respect to "Ipana Tooth Paste", in that it gave "trading stamps" with purchases of merchandise, redeemable in merchandise when stamps had been accumulated representing purchases of $99.00. The minority of the appellate court agreed with the plaintiff that "a sale of goods accompanied by trading stamps is a sale at a reduced price."

However, the court held in accordance with the following excerpt (page 848):

" 'There is also a time honored maxim of the law which applies in this case, to-wit: "de minimis non curat lex". As Broom says in his Legal Maxims: "Courts of Justice generally do not take trifling and immaterial matters into account". In "The Reward", 2 Dods, Admr.R. 269, Sir W. Scott observed, "The court is not bound to a strictness at once harsh and pedantic in the application of statutes." If * * * a customer spent $99.00 in Lit Brothers Store for the purchase of 396 tubes of Ipana Tooth Paste (a supply adequate for a long life-time) he would be obtaining in the form of merchandise a discount of 1.76%.

" 'Thus, apparently holding that a discount of 1.76% was "de minimis", the court refused an injunction.'

\* \* \* \* \* \*

"We now, to show a similar recognition of the maxim by the Supreme Court, quote an excerpt from an opinion delivered by Mr. Justice Stone (1939) in National Labor Relations Board v. Fainblatt, et al., 306 U.S. 601 [59 S.Ct. 668, 83 L.Ed. 1014]:

" 'Examining the Act in the light of its purpose and in the circumstances in which it must be applied, we can perceive no basis for inferring any intention of Congress to make the operation of the Act depend upon any particular volume of commerce affected more than that to which the courts would apply the maxim *de minimis.*' "

 If the range of percentages under the de minimis rule runs as high as 1.76% to a low of ⅒ of 1%, then the percentage of time spent as to total federally aided projects of less than .063% is within the range and the Commission should have followed this rule in the instant case.

 The next question raised by the petitioners is that the Director of Conservation is not employed in connection with an activity financed in whole or in part by "loans or grants" from the United States or any Federal Agency. The record here shows that the State of Illinois, on fish and game matters, spends its money to complete projects that are eligible for Federal reimbursement upon approval of a project plan. Thus the proportionate part of the money is repaid to the State in accordance with the terms of the cooperative contracts entered into under the sanction of State and Federal law on the subject. Since no money is to be repaid to the United States, it cannot be said that a "loan" is involved in the commonly accepted definition of a loan. The term "loan" is not defined in the "Hatch Act". All words in a legislative enactment, absent a definition in the "Act" itself, must be ascribed their accepted, understood meaning. Black's Law Dictionary, 4th Edition, p. 1085, defines a loan as a "lending or borrowing of money or other personal property by a person who promises to return it; that which one lends or borrows". Under this definition, and as the term "loan" is generally understood, it cannot be said that a loan is involved as to any fish and game contract matter. The same is true as to projects under the Clarke-McNary Act, 16 U.S.C.A. § 564 et seq., the Cooperative Forest Management Act of 1950, 16 U.S. C.A. §§ 568c, 568d, and the Soil Bank Program. State money is spent, and, after approval by the appropriate Federal Agency, reimbursement may be received. No federal money is repaid, so no "loan" is involved.

The next question as to whether a "grant" is involved, since the term "grant" is not defined in the "Hatch Act", causes one to look to the meaning of the term. In Webster's New International Dictionary, at page 1089, the term "grant" is defined as "to bestow or confer, with or without compensation", and "a gift or bestowal by one having control or authority over it, as of land, mon-

ey, etc.". While it is true that the State spends its money, anticipating a return of a portion of it, I believe that the term "grant" is broad enough to include the Federal moneys returned or to be returned to the State, under the record in this case.

The facts and law as herein set out are adopted as findings of fact and conclusions of law by the Court, and for the reasons herein set out the Court finds and determines that the order of the United States Civil Service Commission is not in accordance with law.

Accordingly this case is remanded to the Commission with directions to set aside the Order, and to dismiss the Letter of Charges.